ROSE M. PEARDON, APPELLANT, *v.* ROSWELL C. PEARDON, RESPONDENT.

No. 3522

December 22, 1948.　　　　　　　　201 P.2d 309.

718

*Samuel Platt,* of Reno, for Appellant.

*Brown & Belford,* of Reno, for Respondent.

## OPINION

By the Court, HORSEY, J.:

On June 6, 1945, the plaintiff, Roswell C. Peardon, respondent herein, commenced an action for divorce from the defendant, appellant herein, Rose M. Peardon, upon the alleged ground of desertion. The complaint contained the allegations that there were no children the issue of the marriage, and that there were no property rights of the parties to be adjudicated in the action. The parties will be designated hereinafter as plaintiff and defendant, as they were in the lower court.

On August 4, 1945, the plaintiff caused to be filed and served an amended complaint, and in a second alleged cause of action, as an additional ground of divorce, he alleged that the defendant had treated him with extreme cruelty. In the amended complaint it was again alleged that there were no property rights to be adjudicated in the action.

On September 24, 1945, the defendant, by her attorneys, Messrs. Platt & Sinai, filed her answer and cross complaint, in which she denied, among other allegations, the allegations of paragraph IV of the complaint, alleging that there were no property rights of the parties to be adjudicated in the action. She denied, also, the allegation of desertion in plaintiff's complaint, and in her cross complaint alleged as a ground for divorce that the plaintiff had treated her with extreme cruelty.

In paragraphs V, VI and VII of her cross complaint, the defendant wife alleged, fully, facts and circumstances concerning the property rights of the parties, and all material allegations in said paragraphs V, VI, and VII are denied in the plaintiff's answer to the cross complaint, which answer was filed October 18, 1945.

In order to present a clear picture of the transaction between the parties concerning which there is controversy as to matters of fact and law, it seems advisable to incorporate herein said paragraphs V, VI, and VII of the cross complaint, defendant's prayer for relief following such allegations, and the exhibits "A" and "B" thereto attached. Said paragraphs, prayer and exhibits are as follows:

"V. That on or about the first day of May, 1941, in the City and State of New York, the said plaintiff, Roswell C. Peardon, transferred, assigned, made over and conveyed to the said defendant and cross-complainant, Rose M. Peardon, all of his right, title and interest in and to certain inventions and improvements in connection with the detection of and protection against submarines and torpedoes, together with his interest in a certain agreement dated April 22, 1940, executed between him, the said plaintiff, Arthur B. Chapman, and Herbert M. Laford, a copy of which said transfer and assignment is attached hereto, made part hereof and marked Exhibit 'A.'

"That at the time of said transfer and assignment, the said plaintiff owned a one-third (⅓) partnership

interest in and to said inventions and improvements. That said partnership interest at said time, and ever since, is and has been known under the trade name of 'Navigation Instrument Company.' That one of the moving considerations for said assignment and transfer as stated by plaintiff was that defendant 'had been through hell and that she was a peach.'

"That it was understood and agreed between plaintiff and defendant, that the plaintiff should share to the extent of twenty-five (25%) per cent of the net profits earned and distributed from and out of said one-third ($\frac{1}{3}$) interest, and that each of the parties should assume and pay all income and other taxes, Federal and State, levied, assessed or due or owing on his and her respective proportionate interests and earnings as aforesaid. That plaintiff has not paid any part or portion of said taxes, nor has he paid or reimbursed defendant for any part or portion thereof.

"That later, on or about the 21st day of September, 1943, by duress, coercion, undue influence, fraud, personal abuse, threats and force inflicted by plaintiff upon defendant and cross-complainant, immediately prior to the signing of the contract hereinafter referred to, and for a long and continuous period of time prior thereto, the parties entered into an agreement whereby the said defendant transferred to plaintiff one-half ($\frac{1}{2}$) of all profits, bonuses, or other distributions derived 'from the stock of the Navigation Instrument Company registered in her name,' a copy of which said agreement is attached hereto, made a part hereof, and marked 'Exhibit B.' That on the day preceding the signing of the agreement by defendant, and while the parties were in their apartment, the plaintiff demanded of defendant that she return to him her interest in Navigation Instrument Company. The defendant was sitting on a couch and the plaintiff stood over her loudly and harshly repeating his demands, shouting at and abusing her, and when she attempted to get up, pushed her down and spit in her

face. This course of conduct continued for hours; and defendant, tired, aching, exhaused and fearing for her safety agreed to turn over a half-interest and to sign the agreement, which she subsequently did, much against her will, judgment and independent volition. That plaintiff never suggested to defendant that she seek independent professional or other advice as to the form or substance of the agreement, and she had no technical knowledge of its legal force and effect. Plaintiff's conduct, as aforesaid, was a continuation and culmination of similar previous abusive treatment prior thereto, and over a long period of time, which added to her fears for her own personal safety unless she submitted to plaintiff's will and demands, and which said abusive treatment continued subsequent thereto. The following are but a few examples of such conduct and treatment:—

"In June, prior to the execution of the agreement, at. Louisville, Kentucky, following a wedding of defendant's niece, and a party at the home of Mr. and Mrs. T. Harmetts, plaintiff, by word and act, became so abusive toward defendant, that her sister was forced to intervene.

"Later, in the same year, plaintiff literally wrecked their New York apartment, and defendant was so fearful of bodily violence that she summoned plaintiff's attorney.

"Upon another occasion, plaintiff yelled and shouted, called defendant's mother 'A God-damned d—— son-of-a bitch' and violently struck defendant.

"From August 23 to August 28th, plaintiff was constantly drunk, repeatedly called defendant vile and approbrious names and spat upon her. From September 6th to 11th plaintiff repeatedly called defendant vile names and called her a s— b—— and a thief in public.

"On October 22nd, while the parties were motoring, plaintiff said to defendant, 'This is one night you won't get home alive.'

"During the month of·November, plaintiff left a service revolver and a small revolver and ammunition about the apartment, causing defendant much anxiety and fear.

"On November 9th, plaintiff came home awoke defendant in the middle of the night, told her that to show her how much he hated defendant, he was going to urinate on her (which he attempted). While defendant was defending herself, plaintiff punched. her arm until it was black and blue.

"VI. That said above agreement of date on or about September 21, 1943, (Exhibit 'B') was so signed and executed by defendant, under and by the duress, coercion, undue influence, fraud, personal abuse, threats and force inflicted by plaintiff upon defendant, while the parties were occupying the fiduciary relation of husband and wife. That said agreement, ever since said date was, ever since has been, and is now, void, and of no legal force and effect.

"VII. That defendant is informed and believes, and upon information and belief states the fact to be, that plaintiff has been paid, and has received and collected the approximate sum and amount of Thirty-six Thousand One Hundred and Seventy-three Dollars and Thirty-three Cents ($36,173.33), based upon the agreement ('Exhibit B') so wrongfully obtained and of no legal force and effect, and has wrongfully deprived defendant and withheld from her the sum of Twenty-six Thousand Seven Hundred Ninety-eight Dollars and Fourteen Cents ($26,798.14) to which she was and is justly entitled under the agreement dated May 1, 1941 ('Exhibit A'), and the private understanding between the parties, as hereinabove alleged.

"Defendant and cross-complainant further alleges that from and out of the first revenues received by her representing her seventy-five (75%) partnership interest with plaintiff, ('Exhibit A' and said agreement), she purchased a farm at Green Lane, Pennsylvania, which

she voluntarily placed in the name of both parties hereto, and which now so stands of record. That the approximate market value of said property is more than Six Thousand Three Hundred Dollars ($6,300.00).

"Wherefore, defendant and cross-complainant prays that the plaintiff take nothing by said action, and that the defendant and cross-complainant be granted a decree of divorce from the plaintiff forever dissolving the bonds of matrimony now and heretofore existing between the above named defendant and plaintiff, and that each be restored to their original status of unmarried persons.

"That the agreement dated on or about September 21, 1943, (Exhibit B attached to said Answer and Cross-Complaint) be rescinded and canceled, and ordered, adjudged and decreed to have been null and void at the time of its signing and execution and at all times since, and now is, null and void and of no legal force and effect.

"That it be ordered, adjudged and decreed that the agreement dated May 1, 1941, (Exhibit 'A' attached to Answer and Cross-Complaint), together with the mutual oral understanding between the parties, was, and is now, in full force and effect.

"That the plaintiff be ordered to pay the defendant and cross-complainant the sum of Twenty-six Thousand Seven Hundred Ninety-eight Dollars and Fourteen Cents ($26,798.14), or such other sum or amount as the Court may find from the evidence is and has been wrongfully, unjustly and illegally paid to the plaintiff and withheld from the defendant and cross-complainant.

"That the plaintiff be ordered and directed to set over, transfer and assign all of his twenty-five (25%) percent right, title and interest in and to the agreement dated May 1, 1941 as and for maintenance and support for the defendant and cross-complainant.

"That the Court forthwith issue its restraining order forever enjoining and restraining the above named plaintiff from requesting, demanding, or receiving from

the Navigation Instrument Company, its successors, assigns or associates, or the defendant—cross-complainant herein, any further sums, monies, revenues, profits, dividends, or net earnings from and out of the partnership relation referred to in 'Exhibit A' attached to the Answer and Cross-Complaint.

"For such other and further relief as the Court may find meet and proper in the premises."

### "Exhibit A

"I, Roswell C. Peardon, hereby transfer, assign, make over and convey to Rose M. Peardon, residing at No. 227 East 57th Street, New York City, all my right, title and interest in and to certain inventions and improvements originated by me in connection with the detection of and protection against submarines and torpedoes, together with any interest in a certain agreement dated April 22, 1940, executed between Arthur B. Chapman, Herbert M. Laford and myself. Dated, New York City, May 1st, 1941.

In presence of:
Julian D. Rosenberg

Roswell C. Peardon (L.S.)"

### "Exhibit B

### "Agreement

"This agreement made this — day of September A. D. 1943 by and between Rose M. Peardon and Roswell C. Peardon

Whereas, Rose M. Peardon is the owner of certain shares of stock of the Navigation Instrument Company, Newark, New Jersey, a partnership, now therefore in consideration of the sum of One Dollar and other good and valuable considerations receipt whereof is hereby acknowledged, it is agreed

(1) That Rose M. Peardon hereby transfers one-half of all profits, bonuses, or other distributions derived from the stock of the Navigation Instrument Company registered in her name, and the Navigation Instrument

Company is hereby authorized and directed to make payment of the same directly to Roswell C. Peardon.

(2) That this assignment shall be irrevocable, and one-half of the stock now registered in the name of Rose M. Peardon shall be and continue to be chargeable with the payments as above set forth.

(3) It is understood and agreed that Roswell C. Peardon will pay all taxes, both Federal and local on his one-half share.

In Witness Whereof, the parties have hereunto set their hands and seals the day and date above mentioned. A. Sproul, Jr.

> Rose M. Peardon (seal)
> Ros. Cameron Peardon (seal)
> Roswell C. Peardon"

It may be noted that the determination of the relative rights and interests of the parties in a one-third interest in Navigation Instrument Company and, particularly, in the income and profits derived from such interest, depends upon the proper interpretation of exhibits "A" and "B," and their effect.

Stated briefly, the contention of the defendant wife is that, by virtue of exhibit "A," which is the transfer and assignment to her by the plaintiff husband of all his right, title and interest, which amounted to a one-third interest, in and to certain inventions and improvements originated by him in connection with the detection of and protection against submarines and torpedoes, together with his interest in a certain agreement dated April 22, 1940, between himself and Arthur B. Chapman and Herbert M. Laford, the plaintiff husband intended to, and did, make an absolute gift to her of all of said one-third interest, subject to an understanding between them, reached through correspondence between the plaintiff husband and Julian D. Rosenberg, the attorney who prepared the said instrument and who was a friend of both parties and acting for them mutually,

that the plaintiff husband was to have the use and benefit of 25% of the income and profits to be derived from such one-third interest.

On the other hand, the plaintiff husband contended that because of his position as a naval officer he had become disqualified, under certain naval regulations, to own or hold his interest in Navigation Instrument Company, which company was negotiating, or intending to negotiate, through the Electro Protective Corporation, to sell such detection instruments or devices to certain governmental departments or agencies—perhaps to the navy department, with which the plaintiff was directly connected, as a lieutenant commander in the navy; and that, therefore, his intention was to transfer, by exhibit "A," to the defendant wife such interest in trust, merely, retaining the full beneficial title in himself.

It is readily apparent that the question of which of these claims or contentions is correct is the most vital point in the case, for its determination not only establishes the effect of the original transfer (Ex. "A") from the husband to the wife, but very materially affects the questions of the validity or invalidity, and the effect, of exhibit "B," which is a purported reassignment back to the husband by the wife of "one-half of all profits, bonuses, or other distributions derived from the stock of the Navigation Instrument Company registered in her name." If the transfer from the husband to the wife was, as he contends, in trust merely, then the effect to be given to the element of duress, coercion and undue influence, alleged by said wife in her cross complaint and testified to by her, in detail, at the trial, but denied by the husband, and if such element were established by the evidence would under the proper application of legal and equitable principles, be quite different from the effect properly to be attributed to such duress, coercion or undue influence, if the husband were, by such reassignment, obtaining, without consideration, a property interest belonging beneficially to his wife. The

distinction is referred to on page 15 of plaintiff's brief, as follows:

"While we emphatically deny the story of the wife as to the circumstances of the reassignment it is difficult to see how she was prejudiced, whatever those circumstances may have been. The finding of the lower court, based upon ample evidence, was 'that the property transferred to defendant by such assignment was in fact transferred to her in trust with the definite understanding by both parties that the same would be re-assigned to plaintiff as soon as he was permitted to own the same.' (Tr. Vol. I, p. 33, lines 11 et seq.) In making the reassignment the wife did only what she was required to do in equity and good conscience."

We believe it was that theory which caused the lower court to find that the reassignment by the wife to the husband (Ex. "B") "was executed by defendant freely and voluntarily and without duress, coercion, undue influence, fraud, personal abuse, threats or force of any kind or character," rather than that the court intended to find from the evidence the absence of duress, coercion, undue influence, etc. The learned district judge, having found the existence of a trust in favor of plaintiff husband, doubtless then applied the theory of the plaintiff as stated also in plaintiff's proposed additional findings, to the effect that the duress, coercion or undue influence, even if established, could be disregarded, as the wife, in view of her duty under the trust, would be deemed to be acting from the standpoint of her duty to return the property, and not because of the effect upon her of such duress, coercion or undue influence. The next sentence of the lower court's findings, immediately following the sentence referring to duress, coercion, etc., above mentioned, so indicates, and is as follows:

"That said agreement was executed by reason of the fact that plaintiff's disability to hold the property therein mentioned had been terminated and that under the terms of the trust hereinbefore mentioned it was the duty of defendant to reassign said property to plaintiff."

The learned trial judge may have felt further justified in disregarding such element of duress, coercion and undue influence because, as disclosed by the evidence, the acts of abuse, demands and physical violence testified to by the wife, if same occurred, took place on the night before the wife actually signed exhibit "B."

If, however, the trial court had not found the existence of a trust in favor of the husband as beneficiary, but had found the existence of an absolute gift from the husband to the wife, then, as contended by the wife's attorneys, her rights would have to be determined by entirely different standards, because as will be pointed out more fully hereinafter, the relation of husband and wife is one involving the highest trust and confidence. At common law, and under the rules and principles of equity as evolved by the chancery courts of England during a very early period in the history of Anglo-Saxon jurisprudence, the husband was classified as the superior or dominant personality in the relationship of husband and wife, and she as the weaker, more dependent and more confiding personality. In transactions with his wife, particularly those whereby he obtained benefits and she suffered detriment, as is the case where by means of the transaction the husband obtained property belonging to the wife without adequate consideration, the husband's position was treated as being similar to that of a guardian in a transaction whereby he obtained the property of his ward, or in which a parent realized advantages or benefits in transactions concerning his child's property, or in which an attorney benefited unduly in transactions with a client. Because of the great difference in the relative positions of such persons, the chancellors presiding in equity courts when the rules and principles of equity were being formulated and developed, clearly realized the necessity of the closest scrutiny of such transactions in order to prevent the influence of the one in the stronger and more predominant position being employed to perpetrate an imposition or an unjust and inequitable result upon the one in the weaker position.

In the case of Crawford v. Crawford, 24 Nev. 410, 56 P. 94, 96, decided by this court in 1899, under the peculiar situation existing in that case the court found it was unnecessary to decide whether, by our statute (then Gen.Stats. 517, now sec. 3373, N.C.L.1929, vol. 2), the legislature intended to adopt the rule of the common law in this class of cases, under which the husband was recognized as the superior party in the relation of husband and wife. In that case the husband, under the facts and circumstances therein involved, claimed that the wife was in the superior position, and that she had taken an unjust advantage of him. And Mr. Justice MASSEY, in the opinion, because he wished to determine the husband's contention entirely on the merits, apparently took the view that a "hard and fast" holding of strict adherence to the common law as to the force and effect of that statute, might preclude a fair determination on the merits of the husband's contention. The learned justice did state, however, that "our statute regulating the domestic affairs in respect to the community property recognizes the superiority of the husband in this relation."

The common law, particularly as developed and applied under modern conditions prevailing in the states of the American Union having the common law as the basis of their jurisprudence, permits the wife to be the superior and dominant factor under facts and circumstances justifying such characterization. We feel no hesitancy in stating that had Mr. Justice MASSEY been writing his opinion now, under conditions generally prevailing, instead of in 1899, we believe he would have felt entirely justified in declaring that the legislature, by such statute, intended fully to adopt the common-law rule of the superiority of the husband, generally, in transactions between spouses. In doing so, he would have recognized that with the very general emancipation of women, not only as to the rights of citizenship but in many respects relative to domestic and business affairs and transactions, the common law, under the more modern conception and development, possesses

sufficient flexibility to permit, under such general rule, the relative positions of husband and wife to be readily interchangeable, so that the one or .the other may be recognized, in a particular relationship, as the dominant party or as the dependent party, depending upon the actual facts and circumstances in the particular case.

■ Under both common law and equitable standards, in any transaction by the husband with the wife whereby the husband seeks to obtain the wife's property for himself without adequate consideration to her, no duress, coercion, undue influence, imposition or overreaching will be tolerated. Assuming for the moment, in the instant case, that there was no trust and that the lower court's finding to the effect that there was such a trust was error, the acts of physical and mental duress, coercion and undue influence, to which the defendant testified the plaintiff resorted, were sufficient, if sufficiently proved, to vitiate the reassignment (Ex. "B").

■ Furthermore, if it be correctly found that there was no trust, and that the husband was obtaining, by the reassignment, a 25% greater interest in the income and profits from the one-third interest in Navigation Instrument Company than the 25% thereof to which the wife had agreed, in connection with his transfer of all his interest to her by virtue of the original assignment (Ex. ."A"), and was paying no consideration for the additional 25%, then and in that event the burden of proof would shift to the husband, and the rule which is applied very generally by courts possessing equitable powers would be applicable in such situation, and would require him to prove, affirmatively, that the instrument of reassignment (Ex. "B") was executed without undue influence, and that it was entered into freely and voluntarily, also that it was well understood by the wife, and was fair and equitable to her. As stated in Pomeroy's Equity Jurisprudence, vol. 2, third edition, sec. 957, page 1750: "The transaction is not necessarily voidable, it *may* be valid; but a presumption of its invalidity arises, which can only be overcome, if at all; by clear evidence

of good faith, of full knowledge, and of independent consent and action."

The trial court, upon having found that there was a trust, did not apply the equitable presumption above mentioned, in determining the validity of the reassignment (Ex. "B") by the wife to the husband, nor did the court require him to prove affirmatively, by competent evidence, the absence of undue influence arising from the very relationship of husband and wife. To accomplish the required independent consent and action on her part in such a transaction, she must have independent counsel and advice, which operates to prevent the unimpeded and natural effect of the dominant influence of the husband. Only then does her action become free and voluntary and sufficiently understood within the meaning of equity, and the terms of the transaction must be such as to operate fairly and equitably, in respect to the wife's interest, and the burden of showing these elements of good faith, which must be established to remove the presumption of undue influence and invalidity, presumed from the very relationship itself, is upon the husband.

As a result of the trial in the instant case, the defendant wife was awarded a divorce upon the grounds of extreme cruelty. Some of the acts of cruelty testified to at the trial were stated to have occurred on the night before the wife signed exhibit "B," which, she alleged, was executed under duress, coercion, etc., but, as above pointed out, the learned trial judge, while finding such cruelty to have been proven as a ground for divorce, failed to find that the reassignment (Ex. "B") from the wife to the husband was by reason of it, but he did find, affirmatively, as before stated, that same was executed because, by reason of the trust, it was the wife's duty to make such reassignment upon the termination of the husband's disability, and that such reassignment "was executed by defendant freely and voluntarily and without duress, coercion, undue influence, fraud, personal abuse, threats or force of any kind or character." If

there was not a trust, the husband, in order to be entitled to a finding that the reassignment (Ex. "B") was "executed freely and voluntarily" must have proved that the wife was provided by her husband with, or afforded the opportunity for, independent legal advice, and, as before stated, that the transaction was fair and equitable.

In due time, after the trial had been completed, the wife's attorneys, Messrs. Platt & Sinai, proposed to the court, and served upon opposing counsel, findings and conclusions embodying the theory that an absolute gift from the husband to the wife, by virtue of the original assignment (Ex. "A") had been sufficiently proved, and that the reassignment (Ex. "B") from the wife to the husband, because obtained under duress, coercion, etc., and in the absence of evidence on the part of plaintiff disproving undue influence and establishing the fairness and good faith of the plaintiff husband in obtaining the reassignment (Ex. "B"), same was void. The plaintiff by his attorney, Mr. Belford, duly filed objections to the proposed findings and conclusions, and a request for additions to and modifications thereof. Such proposed additions conformed to plaintiff's theory of the existence of a trust, and consequent validity of the reassignment (Ex. "B"). Such proposed additions to and modifications of the findings and conclusions were as follows:

"That the assignment bearing date the 1st day of May, 1941, copy of which is attached to defendant's Answer and Cross-Complaint as Exhibit 'A' thereto, was made by reason of the fact that plaintiff, as a then commissioned officer in the United States Navy, was not permitted to hold an interest in the devices and agreement therein mentioned.

"That the property transferred to defendant by said assignment was in fact transferred to her in trust with the definite understanding by both parties that the same would be reassigned to plaintiff as soon as he was permitted to own the same.

"That the agreement executed on the 21st day of

September, 1943, copy of which is attached to defendant's Answer and Cross-Complaint as Exhibit 'B' thereto, was executed by defendant freely and voluntarily and without duress, coercion, undue influence, fraud, personal abuse, threats or force of any kind or character. That said agreement was so executed by reason of the fact that plaintiff's disability to hold the property therein mentioned had terminated and that under the terms of the trust hereinabove mentioned it was the duty of defendant to reassign said property to plaintiff.

"That under said last mentioned agreement plaintiff received $16,111.40 and $1,021.22 by checks bearing date the 14th day of October, 1943, and $13,770.23 and $2,065.70 by checks bearing date the 11th day of August, 1944.

"That all said checks were signed by defendant and the two other members of the partnership doing business as Navigation Instrument Company."

Those additional findings and modifications were duly objected to by the counsel for the defendant, but the objections were overruled, and such additional findings were adopted by the court and incorporated in the "Finally Engrossed Findings of Fact and Conclusions of Law."

The defendant wife by her attorney, has appealed to this court from the order denying her motion for a new trial, made on the following three grounds stated in her notice of intention to move for a new trial: "(1) The insufficiency of the evidence to justify the decision of the court; (2) That the decision is against the law; (3) Errors in law occurring at the trial and excepted to by the defendant." Numerous assignments, or specifications, of error to the findings and conclusions of law by the court below have been interposed by the defendant, and they will now be considered, and the questions thereby raised determined.

Specifications of error (1) and (2) are, in effect, that: "The court erred in holding that the assignment from

the husband to the wife was made on or about May 1st, 1941 in the city and state of New York and in failing to find that said assignment was made on or about June 3rd, 1942 in the city of Philadelphia and state of Pennsylvania."

■ There is no doubt from the evidence that the date May 1, 1941, which the original assignment (Ex. "A") bears was not the date upon which the assignment was executed. Mr. Rosenberg, in his deposition, testified clearly that the said assignment was dated back, in order that it might appear to have been made prior to Commander Peardon's entering into the navy. Commander Peardon did not controvert this. We do not believe, however, the specifications of error should be sustained. Both in the wife's cross complaint and in the proposed findings prepared by her attorneys, the date of the original assignment (Ex. "A") was given as May 1, 1941, and, although this was doubtless inadvertent, at least such statement in the proposed findings, it would not be fair to the lower court to find such error to be that of the court, when the court, in finding such date, merely followed the pleadings and the date in the proposed findings as prepared by defendant's attorneys.

Specification of error (3) is in effect, that: "The court erred in finding that when the assignment from the husband to the wife was made, the husband, as a naval officer was not permitted to hold an interest in the device and agreement therein mentioned."

■ The federal statutes mentioned in defendant's briefs, and the orders of the judge advocate general of the navy and the opinions of the attorney general of the United States, referred to in said briefs, have been studied by us, and we are of the opinion that Commander Peardon did not, by reason of his position in the navy, become disqualified to *own* an interest in Navigation Instrument Company, provided that, during his period of active naval duty, he did not participate in any business negotiations or dealings which his company had with the navy, or any other government agency, either

on behalf of his firm or on behalf of the government. The plaintiff's attorney has raised some question as to the right of defendant to rely upon, and this court's right to consider, orders and rulings of the judge advocate of the navy and the opinions of the attorney general of the United States, unless same had been proven or admitted in evidence at the trial. The law, however, does not sustain such contention. We believe we have the right to take judicial notice of the official acts of the head of an executive department or agency of the government, of general public interest. 20 Am.Jur. sec. 44, p. 67. The foregoing conclusion as to disqualification is in accord with the opinion of Attorney General Biddle rendered April 23, 1942, in a case of a member of a law firm who had become a naval officer, and which firm practiced extensively before the United States Patent Office. The plaintiff, in his testimony, referred to a ruling by the judge advocate handed down in 1940, which, he believed, disqualified him to hold such an interest. On November 26, 1940, the following ruling was made by the judge advocate of the navy (CMO 2–1940, p. 209) :

"If an officer of the Naval Reserve, while on active duty, should contemporaneously be employed in any capacity by a person or company furnishing naval supplies or war materials to the Government, naval appropriations would not be available for his pay and such employment would not be lawful."

■ This ruling is doubtless based on the federal act of June 10, 1896, 29 Stat. 361, making unlawful *employment* of a naval officer, while on active duty, by a firm or company furnishing naval supplies or war materials to the government, and providing that naval appropriations would not be available for his pay. This ruling and the act of June 10, 1896, upon which it was based, made *employment* of such person by such a firm or company unlawful, and it has been held that holding any position of active management of a firm or company,

even that of president or a director, constitutes "employment" under the act, and is unlawful. But no ruling or opinion has held, so far as we have been able to ascertain, that a naval officer cannot continue to hold stock or other interest, in a corporation or partnership, which he owned prior to entering the naval service, provided he refrains entirely from all activities in connection with any business his company may have with the government, or any governmental agency. Commander Peardon could not continue to serve as a director of the company, but he could lawfully continue to own his interest. We must, therefore, hold defendant's specification of error (3) well taken, as a matter of law. This does not mean, however, that this court does not believe that Commander Peardon believed, when he made the assignment (Ex. "A") to his wife, June 3, 1942, that he was not permitted to hold such interest. He had been advised by Mr. Rosenberg to that effect, also that it was unethical for him to continue to hold such interest while he was an officer in the navy, and we believe he was sincere in deciding, for that reason and for an additional reason, to make the assignment (Ex. "A") to Mrs. Peardon. Plaintiff's attorney has ably argued that an assignment made under such belief would have the same effect as though actually required. This is true, and if the finding had been that the assignment was made by reason of such belief, rather than by reason of an actual and legal disqualification, we would not be required to sustain this specification of error.

We cannot discern, however, how this question of the original and perhaps the primary motive or reason or purpose of the assignment (Ex. "A") is of any great importance upon what counsel for defendant has called the "pivotal" question in the case, namely: Was the transfer of the husband to the wife (Ex. "A") an assignment to her in trust, made to her *solely* because the husband believed that due to being an officer in the navy he was not permitted to hold such an interest in a company

dealing with the government, and with the intention of retaining the equitable title in himself, or was it, on the other hand, an absolute gift to her, regardless of any other reason he may have had for wishing to divest himself of the ownership, or the appearance of ownership, of such interest? It seems perfectly clear that it would not be unreasonable to conclude, if the evidence so warranted, that a husband, being impelled by what he conceived to be a legal or ethical duty to divest himself of ownership in certain property, might readily decide to part with his ownership fully and completely. Especially would this be likely to be so if the conveyance or transfer was to be to someone near and dear to him, and to whom he had reason to feel an obligation of gratitude. Indeed, in the instant case Commander and Mrs. Peardon had been husband and wife for a long time, about nineteen years, when the assignment (Ex. "A") from him to her was made. They had a married daughter, Patricia. And, as the testimony of both Commander and Mrs. Rosenberg, in their depositions, disclosed, Mrs. Peardon had made many sacrifices for her husband, and been subjected to much ill treatment from him, due to his excessive drinking and ill temper when under the influence of liquor. And Commander Peardon expressed himself, shortly before the transfer was made, to the effect that his wife had been a wonderful wife to him, and he wished her to have the interest in the partnership. A review of the testimony and the correspondence relating to this transaction, at this point, is essential to a correct determination of whether or not the lower court erred in the following finding, to which defendant has assigned error:

"That the property transferred to defendant by said assignment was in fact transferred to her in trust with the definite understanding by both parties that the same would be re-assigned to plaintiff as soon as he was permitted to own the same."

The following is, in substance and effect, a portion of

Mrs. Rosenberg's testimony, as same appears in her deposition:

There was an occasion in the summer (the witness did not remember whether it was in 1942), when Mr. Peardon came over to consult about a business matter with Mrs. Peardon. They were sitting in the terrace garden, and Ros (Commander Peardon) came over with another man, Mr. Chapman. It was on a Sunday. The witness thought Mrs. Peardon was there, witness' husband (Commander Julian Rosenberg, an attorney) and herself.

"Q. And you were sitting around on your terrace? A. Yes, we were sitting in our terrace and we had a drink and Ros said Teddy was so wonderful and he was interested in this Navigation thing and she had been such a wonderful wife and he felt the least he could do was to give her his share in this Navigation Instrument Co. which I knew of very little except he said that she stood for so much and had been working and was self-supporting and had gone without money and he felt he wanted to give this business to her for compensation for the years she had done without."

It is shown by other portions of the testimony that the Peardons and the Rosenbergs had been intimate friends for many years, and frequently visited back and forth, and that on numerous occasions Mrs. Rosenberg had been called in and appealed to, sometimes by Mr. Peardon, and sometimes by Mrs. Peardon, to try to settle differences which had arisen because of his bad treatment of his wife, and his ill temper when he had been drinking intoxicants. Mrs. Rosenberg accomplished reconciliation between them on several such occasions.

The testimony, in part, of Commander Julian Rosenberg, in his deposition, was, in substance, as follows:

That witness is a lawyer by profession; that over the course of years he had represented Commander Peardon in "a lot of little things"; that he knew Commander Peardon had been working, for sometime previous to the spring of 1942, on a torpedo protection device. Some-

time in May 1942, he telephoned Mr. Rosenberg and said he was coming over with Art Chapman. Witness thought that before that Commander Peardon had shown witness a draft of some arrangement which was being made, which had been drawn up by Chapman's lawyer, and he wanted witness to go over it; and on one Sunday Peardon arranged for Chapman to come over to Rosenberg's house. It was sometime in May. The persons he remembered being at his house on that occasion were: Toby (Mrs. Rosenberg), Ros (Commander Peardon), Teddy (Mrs. Peardon), Art Chapman, and himself. Asked what was said by Commander Peardon to witness and to Mrs. Rosenberg, in the living room or on the adjoining terrace, Commander Rosenberg replied:

"I know that at that time Ros was in very good humor, and was very enthusiastic about this invention and he said that he wanted to arrange this thing, he wanted Teddy to have it. He spoke of the years, the tough years they had and wanted Teddy to have this thing and he wanted it drawn up right so that she would be protected. There had been a very short partnership agreement between Laford, Chapman and Ros, where each had one-third. It was just an agreement. I don't think they had adopted the name of the company at that time and he wanted to—first he wanted his one-third assigned to Teddy. He wanted me to take care of the matter for them. * * * I know finally when Chapman arrived there were some pleasantries and we sat out in the roof garden and then Chapman and Ros and I went down to the dining room. That lasted a few hours. There were two contracts to be drawn. One was a partnership agreement for Teddy, between Teddy, Laford and Art Chapman under the name of the Navigation Instrument Company and there was another agreement between the Navigation Instrument Company and the Electro Protective Corporation which was controlled and owned by Art Chapman."

"Q. Did you draw the necessary papers? A. There were several drafts, yes, and they were ironed out

between Art's counsel and myself * * *. I submitted copies of them to Ros for his approval. There was some correspondence. I forwarded them to Philadelphia. I received several letters from him" (Commander Peardon).

The witness was then shown a paper dated June 1, 1942, and testified he received "that letter." He stated he knew the hand writing of. Commander Peardon, and identified the signature at the end of the letter as Commander Peardon's signature. The said letter was then offered and admitted in evidence and marked "Defendant's Exhibit 1," and is as follows:

> "United States Navy Yard
> "Philadelphia, Pa.
> "Naval Aircraft Factory
>
> "June 1, 1942.

"Dear Julian.

"I have just read over the papers in re Instrument Co. Three things struck me which I will talk to you about the next time I see you. 1. I see no practical reason why; inasmuch as this co is simply a holder of Patents & idea and not a manufacturing Co. why ~~it is necessary to~~ not have all parties sign checks. except when waived because of a trip or some other emergency. The checking Acct need not be active. a check to cover petty expenses once a month is all that is required. And where dividends are checked out.

"If it is your opinion that it is not ethical for me to be in the business I am willing to abide by your advise. However I desire to have some understanding with regard to the funds—I am not contemplating any divorce.—I don't know any blonds.—I don't like them. But I want some money for my use without having to ask for it. I certainly think that 30% is as you agreed and as Ted understood not ~~so~~ asking too much. As a matter of fact, I know no men who ~~wh~~ would give over as much. When you consider the expenses that I have been put to since last fall and the hellish time Ive been thru. A little relief xxxxxxxxxxx is not a bad idea.

So please lets understand the idea and if youll fix the business up that way its L.K. with me. I will see you about it this week end.

"It was as always so good to see you both.

"Sincerely<br>Ros."

The witness was then asked if he wrote Commander Peardon a letter in answer to defendant's exhibit "1," and answered that he did, and was shown a paper dated June 2, 1942, and asked if that was a carbon copy of that letter, and answered: "That's a carbon copy of the letter I wrote to Ros in answer to the letter, Defendant's Exhibit 1." The said carbon copy of the letter dated June 2, 1942, was then offered, admitted in evidence and marked "Defendant's Exhibit 2," and is as follows:

"June 2, 1942

"Lt. Commander Roswell C. Peardon
"Naval Aircraft Factory
"U.S.Navy Yard
"Philadelphia, Penna.

"Re: Navigation Instrument Co.

"Dear Ros:—

"Art Chapman called me up and is anxious to get these agreements executed so that we may go ahead, I received your letter this morning. Frankly I see no reason why another week should go by without this matter being ironed out. Dealing with your three matters;—

"(1) The checking account. Paragraph Third provides that the partnership shall designate the signatories to all checks leaving the matter subject to control. Art is willing that Ted sign all checks. There is no problem or need for me redraft these agreements for a *fourth* time inasmuch as all our points have been incorporated.

"(2) I am glad that you are abiding by my advice re Teddy's appearing as the interested party in dealing with the government. Remember it was you who suggested this in the first place. I called Ted and it was her recollection that you originally wanted 25% not

30%. That is also my recollection. I think she will give you a written agreement re the 25%, if you want it. Again frankly I feel that it would be preferable to have such an adjustment rest on oral and complete understanding between man and wife. That such a matter should be the occasion for haggling and bickering passes my comprehension. Why Art should be held up by internal dissension between you and Ted is another puzzle. Of course the deal is yours and Ted doesn't come in except in the utterly *minor* capacity as your wife. There should be no question of meum and teum. Settle it somehow, I really ought not to figure in so intimate a matter. Please let us stop 'bitching' up this matter with irrelevant bed chamber wrangles which ought not exist. Let us get on with the main business. If there is any substantial insufficiency in these agreements, I am ready to do them over. But I am justified in not wanting to fight mere tempermental objections. I want to work for the Navigation Instrument Co., and do not seek to represent the Metropolitan Opera Company. Straighten this out with Teddy and execute the assignment. Sometimes I have to kick you in the stern sheets for the good of your soul.

"And so to the head! My best."

The witness then testified that Commander Peardon executed the original assignment (Ex. "A"), and sent it back under cover of a note, on the stationary of the Naval Aircraft Factory, and that it was received by the witness, Mr Rosenberg. The undated note referred to was offered, admitted in evidence and marked "Defendant's Exhibit 3," and is as follows:

"U. S. Navy Yard
"Naval Aircraft Factory
"Philadelphia, Pa.

"Dear Julian:

"Enclosed is assignment. You may sign it as a witness. There is no one here to do so. "Sincerely
Ros."

Upon cross-examination by Mr. Smith, Commander Peardon's attorney, Commander Rosenberg testified, in part, as follows:

"Q. Please note the date, it says, 'New York City, May 1, 1941.' A. I have noted it.

"Q. Did you date it? A. I did.

"Q. Then, this transaction according to this assignment occurred in 1941? A. It was dated back.

"Q. What was the reason for the dating of it back? A. One of the reasons for dating it back was the fact that Ros had gone into the navy and he himself had raised some point as to whether being in the Navy, whether the thing should be in his name.

"Q. As a matter of fact, that was the sole reason, was it not, the original discussion that you had with him, in respect of an assignment of his interest in this partnership, was his statement to you that he understood that there was a Navy rule or regulation to the effect that no naval officer could be engaged in business in any firm that was in any way doing business with the Navy Department? A. Did you say sole reason? No.

"Q. That was one of the reasons? A. It was a consideration.

"Q. And it was a very great consideration? A. I would say a consideration.

＊　　＊　　＊　　＊　　＊　　＊　　＊

"Q. And there isn't any doubt that one of the considerations for the assignment was the fact that Commander Peardon was made aware of a Navy regulation that might jeopardize his position with the Navy? A. It was one point that he raised.

"Q. And was it your suggestion or someone else's suggestion that the assignment be made to Rose so as to avoid difficulty with the Navy Department? A. Ros himself suggested that in part but that wasn't the whole story.

＊　　＊　　＊　　＊　　＊　　＊　　＊

"Q. And as a result of the meeting that was held at

your home at that time, Ros Peardon conveyed his interest in the partnership of 1940 to Rose and a new partnership known as the Navigation Instrument Company was set up? A. I wouldn't say immediately as a result because he left the meeting. When he left the meeting it was understood that he was going to do so but he later raised some objections to doing it.

"Q. As a result of all of this transaction—A. All the circumstances together lead to that but I want to be strictly accurate.

 * * * * * * *

"Q. What did you mean in your letter of June 2, 1942 when you make this statement, 'I am glad that you are abiding by my advice re Teddy's appearing. as the interested party in dealing with the government'? A. What did I mean by that? If you take the letter as a whole, what I meant by the whole thing was this, he himself was the one who spoke about what he wanted to do for Teddy. In the beginning he approached it in a double-barrelled way. He did raise the point of the Navy but he also wanted to take care of Teddy. The picture was one, here, the family had all these stormy troubles and years when Teddy had to work and Pat had to work and now they had high hopes, Ros was always a man who was going to hit the jackpot and now that the jackpot was going to come he was going to do something for Teddy and also at the same time he did raise this point about the Government. Then later he didn't want to go ahead with the assignment and as you see from the letter, I had more or less to get him to change his point of view and then he wanted to know how much he was going to get back and frankly I wanted to get on with the agreement and at that time, as you can see, I was trying to make peace and hammer them into line, both of them, so I said come across with the assignment and let us get on with this job."

If, as the trial court found, "the property transferred to defendant by said assignment was in fact transferred

to her in trust with the definite understanding by both parties that the same would be re-assigned to plaintiff," and if the reassignment (Ex. "B") was, as the court fur-· ther found, "so executed by reason of the fact that plaintiff's disability to hold the property therein mentioned had terminated and that under the terms of the trust hereinabove mentioned it was the duty of the defendant to re-assign said property to plaintiff, why is there no expression in such instrument mentioning, or at all indicating, a trust? Said instrument (Ex. "B") was made more than fifteen months after the original assignment (Ex. "A") transferring Peardon's interest to the defendant wife, and recited that "Rose M. Peardon is the *owner* of certain shares of stock of the Navigation Instrument Company, Newark, New Jersey, a partnership * * *." (Italics added.) By the instrument's clear recognition of her ownership, and with no mention of a trust or of its termination, and its further provision transferring to her husband "one-half of all profits, bonuses, or other distributions derived from the stock of the Navigation Instrument Company registered ·in her name," no inference whatever can be drawn therefrom that Mrs. Peardon was the holder of merely the legal title in trust for her husband. If same were placed in trust, why not the stock itself, in its entirety, transferred back, for such stock was the equivalent of the one-third interest Commander Peardon had conveyed to her by exhibit "A," and if in trust and the trust were terminated, he would, of course, have been entitled to the entire interest which he had placed in trust, or at least to its equivalent? Instead, the agreement or reassignment (Ex. "B") from the wife to the husband, by the effect of its terms, left Mrs. Peardon still the owner of the legal title to all of the stock, and the equitable owner of one-half of all profits, bonuses or other distributions derived from the stock. This instrument did not, in our opinion, change the ownership of the Peardon interest in the partnership in the slightest, but

did add 25% in the profits, bonuses, etc. to the 25% which the husband was entitled to by reason of the original understanding with his wife, reached through his correspondence with Mr. Rosenberg, and upon the basis of which he executed the original assignment (Ex. "A") to her. The instrument (Ex. "B") bearing no indication of a trust or of its termination, or that it was a reconveyance of trust property to the husband, and a gift back by him to the wife of one-half of the income and profits, is corroborative of the clear inferences of Commander Peardon's letter of June 1, 1942 (defendant's Ex. 1), contending for 30%, and his execution of the original assignment (Ex. "A") almost immediately after Mr. Rosenberg's letter of June 2, 1942, to him, in reply, insisting that the understanding as to the husband's interest was 25%, which together point strongly to the conclusion that Commander Peardon then intended to make an absolute gift to his wife of his entire interest in the partnership, except that he was to receive from her 25% of the income and profits to be derived from such one-third interest. And it is also corroborative of the testimony of both Mrs. Rosenberg and Commander Rosenberg, detailing the statements by Commander Peardon of his intention to transfer the property to his wife, not only because of what he believed to be the requirements of the navy rules and regulations, but, also, that in so doing he might make a gift to her because of what she had done for him and the sacrifices she had made.

Certain expressions in Commander Peardon's letter of June 1, 1942, are significant. These expressions are:

"If it is your opinion that it is not ethical for me to be *in the business* I am willing to abide by your advise. However I desire to have some understanding with regard to the funds—I am not contemplating any divorce.—I don't know any blonds.—I don't like them. But I want some money for my use without having to ask for it. I certainly think 30% is as you agreed and as Ted understood not asking too much. As a matter of

fact, I know no men who would *give over as much."* (Emphasis added.)

This, reasonably interpreted, means he did not wish to be *in the business* at all, because, in Commander Rosenberg's opinion, it was not ethical, but that he did want 30% of the *funds,* he didn't think 30% was asking too much, and he knew no men who would give over as much as he was giving,—all in excess of such 30%. In the absence of clear evidence to that effect, no court would have the right to say that Commander Peardon was merely *pretending* to get out of the business; that he was placing the interest in his wife's name merely *to appear* not to be in the business, which would have been a fraudulent evasion of the regulations, had they been as he believed them to be. Restatement of Trusts, sec. 4444, comment "d," vol. II, p. 1360. Equity could not have recognized such a trust, even had the parties intended to establish it.

■ ■ Some consideration will be given to the well-established presumption that a conveyance or transfer of property to a wife by a husband is intended as an absolute gift to her, and that such presumption, while a disputable presumption, can be overcome, especially in courts of equity, only by clear and convincing evidence. The case of Andreas v. Andreas, 84 N.J.Eq. 375, 94 A. 415, a New Jersey equity case, is enlightening upon the question of whether a particular transaction between husband and wife is a gift or a trust, the effect of the presumption that it is a gift, and as to what degree of evidence is required to rebut such presumption. In that case the facts, briefly stated, were:

The husband, Wendell Andreas, owned a tract of land in Bergen County, New Jersey, purchased by him in 1889, and before his marriage to Hattie Andreas. Several years later, in 1911, the portion of the land in question was conveyed by the husband to a third party, James A. Van Valen, and by him and his wife conveyed to the defendant. The husband claimed a trust in his favor. The factual situation in that case, and the actual

principles applied therein, are so similar to the situation in the instant case and to the principles which we feel must be applied here, that we feel constrained to quote at length from the opinion. On pages 416 and 417 of 94 A., it is stated:

"The premises in dispute extend along the public highway. The original tract was assessed to the husband as owner. He says that, in order to reduce the valuation for taxation purposes, he set apart the portion of it lying along the public highway, and had the same conveyed to his wife, in order that the whole tract might be assessed thereafter in two plots instead of one, hoping thereby to effect a reduction in the total ratable value of the whole tract. It is clear that the husband had some conversation with the tax assessor as to the manner in which, and for the amount for which the land should be assessed. The year before the conveyance was made to the wife he succeeded in having the frontage assessed in the name of the wife, although she did not then own it, separately from the remainder of the tract, which was assessed in his name. He at that time did not deem it necessary to make a deed, but after some conversation with the assessor it was thought advisable that the land along the highway should be conveyed to the wife, and this was done by the deeds above mentioned. At the time of the conveyance there was no special agreement, either oral or written, by which the wife was bound to hold the title as trustee for the husband, nor was there any agreement on her part to reconvey the same to him. His allegation is that in pursuance of an 'understanding' to that effect, and without any intention of settlement of the property upon his wife, he proceeded to have the deeds in question prepared and executed, and he now files his bill to impress upon the said lands a resulting trust, upon the theory that he, having paid the original purchase price for the land, and having conveyed the same to his wife without consideration, a trust results in his favor which it is the duty of this court to recognize and enforce.

"It is the well-settled rule in this state that where a husband transfers either real or personal property to his wife, it will be presumed that the conveyance and transfer were intended to be by way of voluntary settlement upon her. This, however, is a rebuttable presumption, and the deed having once been made and delivered by which title is vested in her, the burden of proof is on him to establish a different result. And it may be said at this point that where there is conflicting evidence as to a husband's object in making a conveyance of lands to his wife, the ordinary presumption that it is intended as a provision or settlement for her benefit is not rebuttable. Linker v. Linker, 32 N.J.Eq. 174. Therefore if on balancing of the testimony it should be found that the husband has not met the burden of proof, his application to the court must fail. The proceeding must be judged by what took place at the time of the execution and delivery of the deeds, and not by circumstances which occurred afterwards. At this point the evidence of the husband and wife are diametrically opposed. The husband alleges that his only idea was to save the expenditure of a large sum of money for taxes; that he and his wife had discussed the matter, and that it was agreed between them that the course which was subsequently taken should be adopted. The wife says, in relation to that transaction:

" 'He brought a deed home and said, "See what I have done for you to-day," and I looked at it and I said, "What is Van Valen's name doing on my deed?" and he said, "Well in Jersey it is not legal for a man to deed property directly to his wife, so I had to do it through a third person, so there would never be any trouble about it," and he said, "Now you look it over and take care of it; you have got me just as much tied up as I have always had Ackerman; you own the 11 best acres of the farm." '

"And she likewise says that on one or two other occasions in conversations between them the land in

dispute was referred to by him as her property. I do not see how a. resulting trust can arise out of these circumstances. A resulting trust is entirely inconsistent with the evidence in the case. A resulting trust is one that arises by implication of law; as, where a man pays the purchase price of lands and has the deed made in the name of a stranger—there a trust results in favor of the real purchaser—or where a conveyance is made in trust, and trusts are never declared, or fail to take effect, there and in that case a resulting trust arises, likewise by implication of law. But I do not find in this case any circumstances which can lead to such a result, even taking account of the evidence of the complainant only and leaving out of view the evidence of the defendant. On the one hand is the deed,. properly executed, with due observance of all the forms thrown about such instruments to prevent fraud or imposition; on the other hand is the husband alleging that he did not mean to convey the property to his wife irrevocably, with not a scrap of writing to satisfy the somewhat meager requirements of the statute of frauds.

"The situation has been illustrated in this state by a long line of cases, only two or three of which shall be cited. To go no further back than 1882 we find the point much discussed in the case of Lister v. Lister, 35 N.J.Eq. 49, affirmed on appeal in 37 N.J.Eq. 331, Le Gendre v. Goodridge, 46 N.J.Eq. 419, 19 A. 543, Fretz v. Roth, in the Court of Errors and Appeals 70 N.J.Eq. 764, 64 A. 152, and in the very recent case of Down v. Down, 80 N.J.Eq. 68, 82 A. 322, where Vice Chancellor Leaming has collected and commented on all the important cases on the subject in this state.

"In my opinion therefore, the conveyances must stand as valid instruments, and are unassailable on the part of the husband on the grounds laid in the bill.

"The defendant claims also that, even though the decision might be against her on the point of a resulting trust, still the complainant has acted in such a manner toward the subject-matter of the suit as to preclude him

from having any relief. He testifies that the deeds were made in order to divide the large plot into two tracts so as to obtain a reduction of taxes. If this is true, or if we consider his allegations along in relation to it, he must fail in his suit because of the principle laid down in the case of Slocum v. Wooley, 43 N.J.Eq. 451, 11 A. 264. There the complainant conveyed lands to his father-in-law, who died possessed of the same, in order that the father-in-law might oppose the opening of a street through the lands. This he afterwards did successfully, and there was in evidence his parol promise to reconvey the land to the complainant. That transaction was held to be void as against public policy, upon the ground that the court will not aid in enforcement of any contract which has for its object the defeat of a public enterprise, and that the complainant could not recover the lands from the heirs at law of the deceased grantee. The case seems to be directly in point.

"I will therefore advise a decree dismissing the complainant's bill."

This case was reviewed in the highest court of New Jersey, the court of errors and appeals, on appeal from the court of chancery, and the chancellor's opinion, above quoted, and the conclusions reached by him were approved. The opinion of the court of errors and appeals, as reported in 85 N.J.Eq. 210, 96 A. 39, on page 40, is as follows:

"The bill in this case was filed by the husband against his wife to compel her to convey him a tract of land which originally was owned by him, and which he had deeded to her through one Van Valen as a conduit. His claim was that the premises were conveyed to the wife under conditions which created a resulting trust in his favor, and that she refused to execute that trust. The contention of the wife was that the conveyance was intended to be by way of a voluntary settlement upon her. The learned Vice Chancellor before whom the case was heard, after a consideration of all the testimony, concluded that the complainant had failed to rebut the

presumption of a gift in favor of the wife by proof of the convincing character required in such a case. We concur in the conclusion thus reached, and are satisfied with the opinion of the Vice Chancellor upon this point. This being so, we find it unnecessary to consider the other question discussed by him, namely, whether, if the proofs submitted by the complainant had been sufficient to establish a resulting trust, his purpose in creating it (to induce the tax assessor to cut down the assessed valuation of certain lands held by him of which the locus in quo was a part) was so contrary to public policy as to justify a court of equity in refusing its aid in enforcing the trust.

"The decree appealed from will be affirmed."

In Schouler on Marriage, Divorce, Separation and Domestic Relations (sixth edition), section 554, page 566, under the paragraph heading, "Presumptions; Husband's Gift to Wife," the following statement occurs:

"Where a husband causes title to his land to be taken in his wife's name he is presumed to intend a gift to her (81), even though his original intent was to defraud creditors (82)."

In footnote 81, supporting the long-settled and well-established general rule as to the presumption of a gift when a husband causes title to be taken in his wife's name, is a vast collection of authorities, to which we now refer.

Further on in the same section 554, on pages 567, 568, it is stated, in regard to the degree of evidence required to rebut such presumption, that:

"The presumption may be rebutted, and the husband has the burden of proof. The rebuttal evidence may be oral, and must be clear and convincing. Therefore, *if the evidence is conflicting the presumption prevails.*" (Emphasis added.)

In support of this statement, the case of Andreas v. Andreas, supra, is cited by Mr. Schouler. This means, of course, if applied to the instant case, that even if the claim of Commander Peardon, that his transfer of the

partnership interest to his wife was in trust, had been supported by a preponderance of the evidence, but there was some substantial evidence in favor of the wife's claim of an absolute gift, still he could not prevail under the rule, as, in that event, there would be conflict in the evidence, and the evidence would not be so clear and convincing as to rebut the presumption.

The plaintiff's counsel, in his brief, has pointed out that certain authorities cited by defendant's counsel related only to cases involving what might be termed "typical" instances of resulting trusts. The "typical" resulting trust, it is true, is one in which the husband pays the purchase price of land, and causes the conveyance to be made, at the time of the transaction, directly to his wife, by the vendor. In such a case he has never been vested with the title. But that a resulting trust may be created, if the parties so intend, even though the facts and circumstances are different from such typical pattern, is demonstrated by the reasoning in Andreas v. Andreas, supra, and in many other cases. In the Andreas case, the conveyance was not by the vendor to the wife at the time the husband purchased the land, but by the husband himself, indirectly through Van Valen, to his wife, and about twenty-two years after he had purchased the property. And there is no difference, we believe, in the application of the said presumption, whether the property be real or personal.

Was there, in the instant case, that clear and convincing evidence of a trust in favor of the husband, Commander Peardon, which equity requires in order to rebut the presumption that the transfer to the wife, Mrs. Peardon, absolute in form, was a gift to her of the husband's one-third interest in Navigation Instrument Company, save and except as to the 25% interest in the income and profits therefrom, which the wife recognizes to have been agreed and understood? The following is the only evidence in the record, on the part of the husband, as to that question. Commander Peardon testified as to that matter as follows:

"Q. During the time that he was acting for you and at the time this agreement was executed, was it understood by all parties this was simply to comply with Navy regulations? A. That is it exactly.

"Q. And it was given to Mrs. Peardon in trust pending your termination of naval service? A. Yes."

■ As has hereinbefore been pointed out, it would not negative the fact that an absolute gift was made to the wife, that there was another reason, legal or ethical, which prompted or impelled Commander Peardon to divest himself of the interest which he conveyed to his wife. It is sufficient, and entirely consistent with such primary and perhaps impelling purpose, that at some time prior to the transfer he decided to make an absolute gift to his wife, and intended so to do by virtue of the assignment (Ex. "A"). As has been above stated or implied, it would have been the honest thing to do, if he believed it unethical and illegal for him to continue to own the interest in question.

Referring to the first of the above-quoted questions asked Commander Peardon, which was very leading, and his answer, "That is it exactly," he thus stated, in substance and effect, that "during the time he (Mr. Rosenberg) was acting for me and at the time this agreement was executed *it was understood by all parties* this was simply to comply with Navy regulations." (Emphasis added.) By the word "simply," doubtless the meaning of "solely" was intended by counsel for plaintiff. The words "alone," "solely" and "merely" are recognized synonyms of the word "simply." (Webster's New International Dictionary, p. 2342.) The witness, of course, could have applied another recognized meaning to the word "simply," and answered upon that basic understanding. That other meaning is "absolutely" or "without qualification." It would seem that, in view of the fact that Commander Peardon, in his testimony, did not take issue with or contradict the testimony of

Commander Rosenberg, or Mrs. Rosenberg, in any particular relating to what was said or written by Commander Peardon in relation to the transfer of his interest to his wife, even though he carefully studied Commander Rosenberg's testimony during a court recess overnight, and did question other portions of his testimony, and perhaps doubted Mrs. Rosenberg's testimony in regard to certain details of alleged acts of cruelty, the last-mentioned meaning of the word "simply," to-wit, "absolutely" or "without qualification," would be more in conformity to truthfulness. So taken, his statement, "That was it exactly," might well be true, as doubtless all persons understood that Commander Peardon believed he was conveying the interest in order to comply with what he thought were navy regulations or ethical requirements. By applying such meaning, the witness' testimony did not at all refute or negative the idea of a gift to his wife as the result of the method of compliance, with such believed regulation, finally decided upon by him. And being a conclusion, merely, as to what others understood, it was clearly incompetent as evidence.

Applying to the word "simply" the meaning "solely" or "merely," doubtless intended in asking the question, in order to make it appear that the parties understood there was no other purpose than to comply with such regulations, and thereby refute the contention that there was a gift, the answer was merely a conclusion of the witness, and was, therefore, entirely incompetent as evidence, and entitled to no weight, for two reasons: (1) the witness could only surmise or speculate as to what the "understanding" of parties other than himself was; (2) the conclusion reached to the effect that all parties "so understood" was a conclusion of fact, which, in truth, was entirely unjustified, because refuted by the testimony of all those coming within the scope of the meaning of the words "all parties." Certainly, from the

testimony of Commander Rosenberg it could not be concluded that he "understood" there was a transfer "solely" to comply with navy regulations, and that same was, therefore, a trust, and not a gift. Nor could such conclusion be justified by the testimony of either Mrs. Rosenberg or Mrs. Peardon.

Referring now to the remaining question, above quoted, asked the plaintiff by his attorney, and his answer thereto, same meant that the witness affirmed the correctness of the statement embodied in the question, to the effect that the interest of the husband was given to the wife in trust pending his termination of naval service.

■ This was, purely and entirely, a conclusion of law, and incompetent, for two reasons: (1) because the overwhelming weight of the evidence refuted such a conclusion, and it was entirely without factual foundation; (2) for the reason that it was solely for the court to determine, judicially from the evidence, whether or not the interest conveyed was "given" or transferred to Mrs. Peardon in trust.

The incompetency of such a conclusion is elementary in the law of evidence. 20 American Jurisprudence, sections 771, 772, pages 643–645; 32 Corpus Juris Secundum, Evidence, sec. 453, page 91, also sec. 469, pages 109–111. Reference is made, particularly, to the statement on page 111, section 469, of the latter text, as follows: "One cannot testify that he is the owner of property where his ownership is the issue of the case." In support of that statement there is cited, in footnote 1, the following cases: Downs v. Brandon, 49 Ga.App. 198, 174 S.E. 647; Servel v. Corbett, 49 Idaho 536, 290 P. 200. See, also, 22 Corpus Juris, page 534, section 619, footnote 80; 32 C.J.S., Evidence, sec. 469. In such footnote is the following:

"(a) Equitable Title.—It is not competent to ask a witness to state where the equitable title to land is, if he knows. Tillman v. Bomar, 134 Ga. 660, 68 S.E. 504."

To allow Commander Peardon, in the instant case, to state that the property interest was given by him to Mrs. Peardon in trust, is equivalent to allowing him to state that he is the owner of the *equitable* title, and that she is the owner of the legal title. That was permitting the witness to state a conclusion of law, and also, his conclusion as to the principal matter in controversy in this case.

If the lower court had disregarded, as incompetent, the above-stated testimony of Commander Peardon, there was no evidence whatever remaining in the case from which a conclusion could be drawn that there was a trust, and, by which the presumption of a gift to Mrs. Peardon could be rebutted. There was not only the clear inference from Commander Peardon's letter of June 1, 1942, the replying letter by Mr. Rosenberg, and Commander Peardon's action in executing the assignment (Ex. "A"), which plainly proved that he was making an absolute gift to his wife, but there was, also, in the reassignment agreement dated September 17, 1943 (Ex. "B") the recital of her ownership of all the stock representing the partnership interest, and no mention therein of a trust. In further support of the wife's position in this case, we have the presumption that an absolute gift was made to Mrs. Peardon by her husband, which has already been pointed out herein, and which has not been rebutted by any competent evidence whatever.

■ Under the equitable rule as to such presumption, as such rule has been elucidated and explained in many authorities, and concerning which we have no doubt, if there had been a conflict in the evidence on the point in question, such conflict would not be sufficient to deny the gift unless the evidence of a trust was clear and convincing. But in the absence of substantial evidence on behalf of the husband in support of a trust, and when there is no competent evidence at all in support of such trust theory, or in refutation of the proposition that by

such transfer or assignment (Ex. "A") an absolute gift was made by the husband to the wife, save and except that it was understood she was to pay to him from time to time, as she received same, 25% of the income and profits from the partnership interest, the finding by the court to the effect that the transfer from the husband to the wife, by said assignment, was "in trust, with the definite understanding by both parties that the same would be re-assigned to plaintiff as soon as he was permitted to own the same," constituted error as to a matter of law.

It follows from the foregoing treatment of the subject of whether or not there was a gift to the wife from the husband by virtue of the assignment (Ex. "A") and the conclusion, which, after the most careful consideration, we have been constrained to reach, that the lower court's failure to find that said assignment was an absolute gift to the wife for her benefit, subject only to the agreement to pay to the husband 25% of her net income from the partnership and the husband's right of succession to her interest should she die during the term of the partnership, also constituted error as to a matter of law. In the second sentence of the fourth subparagraph of paragraph V of the court's findings of fact, on page 3 thereof, occurs the following:

"That said agreement was so executed by reason of the fact that plaintiff's disability to hold the property therein mentioned had terminated and that under the terms of the trust hereinabove mentioned it was the duty of the defendant to reassign said property to plaintiff."

This finding is erroneous as to matters of law, in two particulars:

1. We are convinced, from a careful study of the federal statutes and of the orders and rulings of the judge advocate of the navy, and of the opinions of the attorney general of the United States, that: (a) there was no disability, at the time the assignment (Ex. "A") from the husband to the wife was made, depriving him of his right to own and hold his interest in the partnership,

hence there could be no termination of such nonexistent disability; (b) neither was there any change in the applicable laws, rules or regulations between June 3, 1942, the date of the original assignment (Ex. "A"), and the reassignment, or agreement, of September 21, 1943 (Ex. "B").

2. In view of our holding that there was no trust relationship created by, or in connection with, the transfer or assignment made June 3, 1942 (Ex. "A"), by Commander Peardon to Mrs. Peardon, we find that it did not become the duty of defendant to reassign said property to the plaintiff under the terms of any trust.

From the foregoing treatment herein of the nature and effect of the transaction which culminated in and was evidenced by the assignment by the husband to the wife of his interest in the partnership, with the exceptions above mentioned, and the conclusion we have reached that the transaction resulted in an absolute gift of such interest to the wife, with the exceptions hereinbefore pointed out, and that there was no transfer in trust, as claimed by the husband, it necessarily follows that defendant wife's specifications of errors numbered (5), (6), (7) and (8) have merit and were well taken.

As previously pointed out, we do believe that the trial court meant to find that in *fact* there was no "duress, coercion, undue influence, fraud, personal abuse, threats or any force of any kind or character" employed by the husband toward the wife, or inflicted upon her on the night before she executed the reassignment or agreement which was executed on the 21st day of September 1943 (Ex. "B"). Having upheld the theory and plaintiff's contention of the creation of a trust, in the husband's favor, by the assignment made June 3, 1942 (Ex. "A"), the trial court concluded, in effect that the said reassignment was actuated or induced by reason of the consciousness of the wife of her duty to reassign upon the termination of the trust, and that, therefore, the same was *not executed* by reason of duress, coercion, etc., but was executed by the wife freely and voluntarily,—

that such duress, coercion, etc., if any there were, might be disregarded, as the wife was giving up only what belonged to the husband by reason of the trust; at least, that is our impression of the lower court's reasoning upon that phase of the case.

But be that as it may, the language of the learned district judge in the fourth subparagraph of paragraph V of the findings of fact, on page 3 (of our copy), may be construed as finding that duress, coercion, undue influence, fraud, personal abuse, threats or force of any kind or character on the part of the husband toward the wife in connection with or shortly prior to the execution of said agreement or reassignment (Ex. "B") were entirely absent—not merely that they did not materially operate to bring about the result. We believe, therefore, that it is our duty to determine the matter definitely.

The defendant, Rose Peardon, testified in considerable detail as to what occurred on the evening, or night, of September 20, 1943, the date immediately prior to the execution of the agreement. She testified, among other things, to the effect that her husband demanded of her that she return the interest in Navigation Instrument Company, which he had previously given her; that the defendant was sitting on a couch, and that the plaintiff stood over her loudly and harshly repeating his demand, shouting at and abusing her, and, when she attempted to get up, pushed her down hard and spat in her face; that this course of conduct continued for hours, and that the defendant, tired, aching and exhausted, and fearing for her safety, agreed to turn over a half interest to him and to sign the agreement, which she did do on the following day. She testified further, in effect, that the agreement was not signed by her freely and voluntarily, but much against her independent consent, will and volition, and that it was signed by her because and as the result of duress, coercion, undue influence, personal abuse, threats and force inflicted upon her by plaintiff.

The following is the husband's only testimony in refutation of the wife's testimony in detail as to the duress,

coercion, undue influence and mistreatment of her by her husband shortly prior to the execution of the said agreement or reassignment (Ex. "B"). His attorney asked him: "You heard the testimony of Mrs. Peardon as to the incidents immediately preceding the signing of the agreement as to your treatment of her, duress, and so forth and so on; is that true?"; and he answered as follows: "That is not true." He does not refer to any alleged *fact* in her testimony, and meet it with any *fact* showing that the true fact is different from that she has stated; in other words, he does not meet *fact* with *fact*, but with *mere general denial, or assertion* of untruth. Furthermore, the answer is entirely too ambiguous, vague and uncertain to have any evidential value. It may mean either that *all* of her testimony concerning his "treatment of her, duress, etc. and so on" is untrue, or that *a substantial portion* of it is untrue, or that there is at least *some difference* as to *a few of the details* as to certain incidents or occurrences; that same, as impressed upon his memory are somewhat different from defendant's remembrance and narrative of same.

It will be noted that Mr. Belford's said question addressed to Commander Peardon was directed to "the testimony" of Mrs. Peardon "as to the incidents immediately preceding the signing of the agreement." Manifestly, this referred to *all* of her testimony as to each and all of such incidents. Commander Peardon's general negative answer, "that is not true," does not reach any specific portion of such testimony. She had testified, among other things, that he demanded that she sign the paper reassigning to him the interest in Navigation Instrument Company which he had previously given her, that the defendant was sitting on a couch and that the plaintiff stood over her loudly and harshly repeating his demand, shouting at and abusing her, and that when she attempted to get up, pushed her down hard and spat upon her. Can it be said that when the plaintiff answered his attorney's very broad and general question referring to her entire testimony, his answer being, "that is not

true," that the witness meant by such answer to deny, for instance, that he 'had demanded that she sign the paper? Obviously, it cannot be so concluded; nor even can it be said with any certainty that he meant to say her *testimony as to such demand was untrue.* The same may be said as to her testimony as to each of the other incidents.

Without being amenable to perjury, the husband could deny, as he did do, her testimony taken as a whole, if his memory as to a single one of such incidents was not essentially the same as hers, or even if, through faulty memory, he did not remember all the details of one or more of the incidents to be precisely as she had stated in her testimony.

■ This sort of nonspecific denial is valueless as evidence, for reasons similar to the rule of pleading which holds pleading by way of a negative pregnant objectionable because ambiguous and uncertain. For instance, if a plaintiff alleges that plaintiff and defendant intermarried on November 10, 1947, at Philadelphia, Pennsylvania, and defendant merely denies the allegation generally, it cannot be determined whether he does so merely because he deems the date or the place erroneously alleged, or he means to deny that any marriage at all occurred. When these facts are alleged conjunctively, the defendant, in answering, if, for instance, merely the wrong date was alleged, could truthfully deny the entire allegation that they "intermarried November 10, 1947, at Philadelphia, Pennsylvania," because they did not intermarry at Philadelphia on the date alleged. Such a denial, without reaching specifically any fact alleged, is considered so fraught or pregnant with the admission of the existence of the facts not actually intended to be denied, that it is called "negative pregnant."

■ Upon similar reasoning, the statment in evidence of Commander Peardon, referring to his wife's testimony "as to the incidents immediately preceding the signing of the agreement as to" his "treatment of her, duress,"

etc., "and so forth and so on," is fraught with admissions that his wife's testimony is essentially true, or he would have denied same specifically as to the facts which did not occur, and would not have contented himself with a negative statement merely asserting the untruthfulness of her testimony. As such negative statement on the husband's part may and should, in the absence of any specific statement by him, be deemed to refer only to Mrs. Peardon's description or narrative of the incidents in her testimony, and not to any essential facts such testimony cannot be deemed *substantial* evidence, in support of the finding of the lower court as to the absence of duress, coercion, etc., if that court intended the finding in question to go to that extent. Nor was such mere general assertion by the husband of the untruthfulness of the wife's testimony as to the incidents of duress, etc., sufficient to create any conflict in the evidence.

 As to the correct meaning of the term "substantial evidence," see vol. 40, Words and Phrases, perm., ed., pages 499–501, and cases cited therein. In Minahan v. Grand Truck Western Ry. Co., 6 Cir., 138 F. 37, 46, Judge Severns indicated what is meant by "substantial evidence," in these words:

"Something of substance and relevant consequence, and not vague, uncertain, or irrelevant matter not carrying the quality of 'proof' or having fitness to induce conviction."

See, particularly, Berkemeier v. Reller, 317 Mo. 614, 296 S.W. 739, 752; Morton v. Mooney, 97 Mont. 1, 33 P.2d 262; Wentworth v. Baker, 101 Mont. 226, 53 P.2d 440; State v. Gregory, 339 Mo. 133, 96 S.W.2d 47, 51, 52; In re Koprowski, 48 Wyo. 334, 46 P.2d 61, 64; Thompson v. Virginia Mason Hospital, 152 Wash. 297, 277 P. 691, 692; Grand Trunk R. Co. of Canada v. Ives, 144 U.S. 408, 12 S.Ct. 679, 36 L.Ed. 485.

The foregoing authorities, and reason, compel the conclusion that the lower court's finding that the agreement

or reassignment (Ex. "B") was executed freely and voluntarily and without duress, coercion, etc., constituted error as a matter of law, there being no substantial evidence to support it.

The said finding of the trial court was also erroneous in other respects. There could properly be no finding that the wife's assignment to the husband of one-half of her right, title and interest to the income, profits and distribution of the one-third interest in Navigation Instrument Company, which had previously been assigned to her by the husband, was freely and voluntarily made and without undue influence, without any effort on the part of the husband, or any evidence offered by him, to prove affirmatively the absence of undue influence, and that the wife's act was free and voluntary. As has been hereinbefore stated, in a transaction between husband and wife whereby she conveyed to him her property without consideration, and it is not shown that he is not the dominant, superior personality in influence and power, the burden of proof shifts, and, by a long-settled equitable doctrine, the burden is placed upon the husband to prove the voluntary character of the wife's act in parting with her property. As Mr. Pomeroy has stated, in section 951, on pp. 1734–1739, of vol. 2, third edition, Pomeroy's Equity Jurisprudence:

"Where there is no coercion amounting to duress, but a transaction is the result of a moral, social, or domestic force exerted upon a party, controlling the free action of his will and preventing any true consent, equity may relieve against the transaction, on the ground of undue influence, even though there may be no invalidity at law. In the vast majority of instances, undue influence naturally has a field to work upon in the condition or circumstances of the person influenced, which render him peculiarly susceptible and yielding,—his dependent or fiduciary relation towards the one exerting the influence, his mental or physical weakness, his pecuniary necessities, his ignorance, lack of advice, and the

like. All these circumstances, however, are incidental, and not essential. Where an antecedent fiduciary relation exists, a court of equity will *presume* confidence placed and influence exerted; where there is no such fiduciary relation, the confidence and influence must be *proved* by satisfactory extrinsic evidence; the rules of equity and the remedies which it bestows are exactly the same in each of these two cases. The doctrine of equity concerning undue influence is very broad, and is based upon principles of the highest morality. It reaches every case, and grants relief 'where influence is acquired and abused, or where confidence is reposed and betrayed.' It is specially active and searching in dealing with gifts, but is applied, when necessary, to conveyances, contracts executory and executed, and wills."

The application of the doctrine to transactions between husbands and wives is stated in section 963, page 1781, of the same volume, and numerous authorities are cited in footnote 5(e).

In Harraway v. Harraway, 136 Ala. 499, 34 So. 836, it is stated in the syllabus:

"1. In action to set aside for undue influence a deed from complainant to her deceased husband for a recited consideration of $1, it appeared that it was prepared by him and executed by her at his request and in his presence, and the evidence tended strongly to show that she executed it only after much pressure. It also appeared that he had managed her financial interests and had been her agent for many years, standing in that relation at the date of the deed. *Held* not to show that the conveyance was fair and equitable, or that it was executed by complainant of her own volition, free from the influence of her husband and agent.

＊　　＊　　＊　　＊　　＊　　＊　　＊

"5. The burden of showing that an exchange of land between a husband and wife on a suit by the wife to set it aside, was just, fair, and equitable, was on defendants."

Because of the presumption arising from the very relationship itself and the superior position of the husband as to the ability to exercise undue influence to bring about a property advantage to himself, equity requires that in a property transaction between husband and wife, in order to assure the free exercise of the wife's will and consent and the voluntary character of her act, she must be provided with independent legal counsel and advice in relation to the advisability and the fairness to her of the transaction. Reference is now made to a Missouri case, Sims v. Sims, 101 Mo.App. 407, 74 S.W. 449, on pages 451 and 452, dealing extensively with these equitable principles, and in which quotations from Story's Equity Jurisprudence, section 251, and from 2 Pomeroy's Equity Jurisprudence, section 951, appear. Also, on said page 452, of 74 S.W., apt quotation is made from Farmer's Executor v. Farmer, 39 N.J.Eq. 211, where it was said:

"A wife may bestow her property, by gift, on her husband or she may make a contract with him which will be upheld in equity, *but the courts always examine such transactions with an anxious watchfulness and dread of undue influence.*" (Emphasis added.)

It is further said in the opinion in Farmer's Executor v. Farmer, supra:

"Where a contract is made by parties holding confidential relations * * * the burden, if the contract is assailed, rests on the stronger party to show that no advantage was taken, otherwise fraud will be presumed."

See, also, Cheuvront v. Cheuvront et al., 54 W.Va. 171, 46 S.E. 233.

The reasoning and excellent presentation and explanation of these equitable principles, by the Supreme Court of Pennsylvania in Lochinger v. Hanlon, 1943, 348 Pa. 29, 33 A.2d 1, cited in defendant's brief and extensively quoted therein, is very impressive. Also, the extensive collection of authorities in the opinion in that case is valuable. Counsel for plaintiff, in plaintiff's (respondent's) brief in the instant case, have cautioned

against engrafting the law of Pennsylvania upon the laws of Nevada. Whilst our law and equity in this state, due to our youthfulness as a state, has not found so frequent and elaborate expression as that of Pennsylvania, we entertain no doubt that the equitable principles so ably expounded in Lochinger v. Hanlon, supra, and in many other authorities of Pennsylvania and of other common law states are the same as those of Nevada, or vice versa. Also, the opinion in the Delaware Chancery case of Peyton v. Willman C. Peyton Corporation, 23 Del.Ch. 321, 322, 7 A.2d 737, 123 A.L.R. 1482, is able and impressive.

In the instant case, Commander Peardon, as before stated, did nothing to remove or rebut the presumption of undue influence or invalidity which equity attaches to the transaction which resulted in the agreement or assignment executed September 21, 1943 (Ex. "B") by Mrs. Peardon. The said instrument, the evidence discloses, was drawn by Commander Bond, a lawyer and associate of Commander Peardon in the naval service, and there was no consultation between the wife and Commander Bond prior to the execution of the instrument. The wife was furnished no attorney to advise her as to the transaction, nor was it even suggested to her that she take time and procure the services of an attorney, and his counsel and advice. In the absence of this, the presumption of undue influence and invalidity was not overcome or rebutted, and the trial court erred as to a matter of law in its finding that the execution was free and voluntary and without undue influence, entirely irrespective of whether or not there was, as a matter of actual fact, duress, coercion or undue influence on the part of the husband. Doubtless, the learned trial judge's conception and finding that a trust existed in favor of the husband accounts for his failure to take into consideration and apply these equitable principles which have existed since the early dawn of Anglo-Saxon jurisprudence.

The remaining equitable requirement as to such a

transaction between husband and wife, which we shall discuss in this opinion, is: Was the agreement or reassignment dated September 21, 1943, (Ex. "B") fair and equitable to Mrs. Peardon? To determine that question properly, we must take into consideration how the agreement has operated and what, in actual practice and application, has been its result or effect. It has been noted. above that although Commander Peardon, upon the trial and in his brief, has claimed and urged the existence of a trust as the result of the transaction culminating in the original assignment from him to his wife, he did not assert any such theory or contention, nor cause Commander Bond to do so, in shaping the transaction resulting in the reassignment from Mrs. Peardon to him (Ex. "B"), nor in the said instrument itself. As has been pointed out, that instrument acknowledged her ownership of all the stock (as the partnership interest was described in the said instrument), and left her still owning the same. Indeed, it would have, most likely, worked out better for her had the instrument provided for a transfer of one-half of the stock, or of the partnership interest which it represented and which was the source of the income and profits, instead of the provision, which the instrument did contain, for the assignment or transfer of "one-half of all profits, bonuses or other distributions derived from the stock of the Navigation Instrument Company registered in her name"; for the Internal Revenue Department, in determining the income tax liability of Mrs. Peardon and Commander Peardon, respectively, found, in effect, that for the reason that she was the owner of the entire one-third partnership interest from which all their income and profits were derived, she was liable for the entire tax, and he was not liable for any of it. Whether or not Commander Bond or Commander Peardon anticipated just such a result by reason of the provisions of the agreement or reassignment (Ex. "B") we cannot know from the record; but the result has been that Commander Peardon, for the taxable years 1942–1946 has received, or

there is distributable to him, under the present judgment, after deduction of $15,000 established by the lower court to reimburse the wife for taxes for which she was liable upon the husband's interest, the total sum of $79,490.83. This amount is entirely tax-free income to him. For the same period of time, the wife has received no tax-free income, but on the contrary, after applying all the income she has received from her interest in Navigation Instrument Company to taxes, has suffered a deficit in the amount of $1,397.10. The computations from which these figures were taken were made, according to the affidavit of Robert P. Weil, Esq. (filed in support of defendant's motion to amend her notice of intention to move for a new trial and for an order vacating, annulling and setting aside the order theretofore made denying her motion for a new trial) by Peat, Marwick & Mitchell Company, accountants, and their correctness has not been assailed by the plaintiff. The trial court, in that court's judgment and decree filed August 1, 1946, did provide that the plaintiff and the defendant should each pay all taxes, federal, state and local, on their respective "one-half share" interest in Navigation Instrument Company, a partnership, and did provide further as follows: "that out of the moneys now owing to or to become due Roswell C. Peardon from said partnership, the sum of Fifteen Thousand ($15,000) Dollars will be withheld to cover any possible taxes that may be paid by or assessed against Rose M. Peardon on the interest of Roswell C. Peardon; that Roswell C. Peardon will not draw, or attempt to draw, any part of said Fifteen Thousand ($15,000.00) Dollars until such time as the tax liability of said parties is finally settled and adjudicated." Such sum of $15,000 has been far insufficient, for, as shown by the computation of said accountants and stated in the said affidavit of Mr. Weil, the total of the amounts of taxes that are chargeable to Mrs. Peardon upon income, profits, or distributions to Mr. Peardon realized by him from one-half of the

said one-third partnership interest in Navigation Instrument Company is the sum of $57,097.58. The computations are part of the record on appeal in case No. 3529, now pending in this court.

The evidence in the instant case discloses that on or about October 14, 1943, and less than one month after the wife made the reassignment (Ex. "B"), she obtained checks from Navigation Instrument Company for her husband's one-half (according to the reassignment) and her one-half of the distribution then due, and called to see Commander Peardon at the officer's club in Philadelphia. The checks required Mrs. Peardon's signature as a director, and before signing and delivering Commander Peardon's checks she tried to prevail upon him to make some provision for his share of the income taxes, for which she had been advised she would be liable. The evidence discloses that Commander Peardon, who had been drinking, treated his wife most cruelly and shamefully upon that occassion. They started to drive home, and, on Broad Street in Philadelphia, a busy thoroughfare, he threw her handbag, containing the checks, into the street. She asked him to stop, and as she was getting out of the car he placed his foot upon the accelerator and started the car suddenly, which caused her to fall into the street. After she recovered the handbag containing the checks and started walking, he drove alongside, had her get in the car, and drove her home. That night she called Commander Bond to obtain advice as to the taxes, and he informed her it was his opinion that Commander Peardon would be liable for one-half the taxes, but this was later proved to be erroneous advice, for when Attorney Smith, Bond's former law partner, prepared the returns for both the husband and the wife, and the taxes for each were remitted, Mrs. Peardon was notified by the Internal Revenue Department of a deficiency which she must pay, because of being liable for the entire tax upon the said partnership interest, and was ordered to return to Commander Peardon the amount of the taxes that his attorney had remit-

ted on account of the one-half interest he had received from the net income, profits and distributions by virtue of such agreement and reassignment (Ex. "B") made by Mrs. Peardon to him on September 21, 1943.

█ It is clear, therefore, from the facts, that in its practical operation and effect the said agreement or reassignment (Ex. "B") has not been fair and equitable to the wife; hence, in that respect, as well as in his failure to remove the presumption of undue influence and to show that it was freely and voluntarily entered into, after independent legal advice, and was well understood by the wife, the plaintiff failed to overcome or rebut, as to such transaction and instrument, the presumption of invalidity. It is our conclusion, after most careful consideration, that the validity of the said instrument was not established as required by the law and by equity, and that the trial court's failure to find said agreement and reassignment void under the existing facts and circumstances constituted error as to a matter of law.

From the foregoing discussion and conclusions we have reached, it follows that assignments or specifications of error (9) and (10) have merit and are well taken.

As to specification of error (11), we are of the opinion that whether or not, in granting the divorce for the husband's extreme cruelty, the wife should have been awarded all of the interest of the husband in Navigation Instrument Company (as her attorney contends) was entirely within the discretion of the trial judge, and we do not deem it incumbent upon us to interfere with the exercise of that discretion.

By reason of the errors of the lower court in the matters of law hereinbefore set forth, we are compelled, in order that justice and equity may prevail as to the rights and obligations of these parties, to reverse the order denying the defendant's motion for a new trial. It is hereby ordered, therefore, that said order made and entered October 8, 1946, in the Second judicial district court of the State of Nevada, in and for the county of Washoe, department 1, denying defendant's motion for

a new trial be, and is hereby reversed, and the cause ordered remanded for further proceedings. We see no good reason to subject the parties to the burden and expense of a new trial. In lieu of a new trial, it is ordered that further proceedings be had in the court below, sufficient and suitable to carry out the findings and conclusions reached by us and decided herein. To that end, the lower court's findings of fact and conclusions of law, dated August 1, 1946, should be modified as follows:

Commencing with the phrase, "that the assignment bearing date the 1st day of May 1941," same being line 5, page 3, of said findings, as appears upon the copy thereof in the record on appeal, said phrase and all the remainder of said page 3 and all of page 4, to the end of the findings and conclusions of the said court, should be stricken, and there be substituted therefor paragraph V (except the first sentence or clause thereof, commencing with the phrase, "that on or about the 1st day of May 1941, in the City and State of New York," and ending with the name "Herbert M. Laford," which is already in the court's findings), and paragraph VI of the defendant's proposed findings of fact, and, also, all of defendant's proposed conclusions of law, both contained in the document entitled "Proposed Findings of Fact and Conclusions of Law," filed in the district court December 20, 1945. There should be included, also, further findings and conclusions suitable to require the repayment by the plaintiff to the defendant of all distributive amounts which shall be proved to have been received from Navigation Instrument Company representing income or profits derived from any portion of the one-third partnership interest originally held by him, in excess of 25% of such income, profits and distributions derived from such one-third partnership interest in Navigation Instrument Company, and such amounts should be ascertained in said further proceedings, and, if proved, included in the judgment. Also, the defendant should recover judgment for such amounts as the proof estab-

lishes she has been required to pay in taxes, federal, state and local, by reason of, or upon, such 25% interest of the plaintiff.

Upon such further proceedings, suitable provision should also be made, if practicable, to require or authorize the deduction from the plaintiff's share of income, profits and distributions hereafter derived from such partnership interest, before same are paid to him, his proper portion of the taxes thereon.

EATHER, C. J., and BADT, J., concur.