464 P.2d 656

**ADVANCED LIVING CENTER, and Advanced Service Center, Appellants,**

v.

**T. J. BETTES COMPANY OF CALIFORNIA,**
a Nevada corporation, Appellee.

**No. 1 CA–CIV 896.**

Court of Appeals of Arizona,
Division 1.

Department A.

Jan. 20, 1970.

Rehearing Feb. 9, 1970.

Review Denied March 10, 1970.

Pain & Julian, by Fred J. Pain, Jr., Phoenix, for appellants.

Anthony O. Jones, Phoenix, for appellee.

STEVENS, Judge.

In this appeal by Advanced Living Center and Advanced Service Center, corporations who will hereinafter be referred to collectively as the Centers, we have been asked to review the evidence presented during a two-day trial to the court sitting without a jury to determine whether the evidence supports the trial court's findings of fact, conclusions of law, and judgment in favor of T. J. Bettes Company of California. The evidence was reviewed in the strongest manner in favor of T. J. Bettes Company, Associated Builders, Inc. v. Stovall, 102 Ariz. 54, 424 P.2d 455 (1967). We have refrained from substituting our opinion for that of the trial court on conflicting evidence, A. N. S. Properties, Inc. v. Gough Industries, Inc., 102 Ariz. 180, 427 P.2d 131 (1967), and where there was competent evidence sufficient to support the trial court's judgment, we have presumed that it ignored or disregarded any inadmissible evidence. State v. Gunther & Shirley Company, 5 Ariz.App. 77, 423 P.2d 352 (1967). In addition, we conclude that no issue can be raised on appeal with respect to that evidence admitted by the trial court over the general objection that it was "irrelevant, immaterial and incompetent." Trial courts "cannot err by overruling such (an objection) unless the evidence is, on its face, obviously inadmissible for any proper purpose." Udall, Arizona Law of Evidence § 12.

In 1961 and 1962 there were two partnerships formed to develop subdivisions in and around the Phoenix area. Because many of the firms referred to in this opinion contain the word "Advanced", we have set down the organizational structure of these two partnerships graphically.

PARKCREST ADVANCED HOMES
Pres. = Julian Keith

ADVANCED HOMES, INC.
Pres. = Julian Keith

T. J. Bettes
Company

B.A.B., Inc.
V.P. = Julian Keith

ADVANCED HOMES
Pres. = Julian Keith

ALMA DEVELOPMENT
CORPORATION
Pres. = Julian Keith

LEE-LAND HOMES, INC.
Wholly owned by
T. J. Bettes Company

As is readily apparent, these two partnerships were essentially partnerships of Julian Keith and T. J. Bettes Company. An officer of Bettes outlined the part it played in financing the subdivisions:

"A. For example, the partnership of Advanced Homes executed a note and mortgage which was secured.

"Q. Payable to whom?

"A. Payable to T. J. Bettes Company of California.

"Q. And T. J. Bettes Company of California was the mortgagee then?

"A. Yes. This was secured then by a piece of land that was purchased with funds from this loan. Then to construct the individual dwellings a separate note and mortgage was given to T. J. Bettes Company of California by Advanced Homes. Each one of these was secured by an individual lot, and then T. J. Bettes Company of California advanced construction funds to Advanced Homes as each of these individual houses reached various stages of construction.

    *     *     *     *     *     *

"Q. And then when the building was completely constructed, and there was a sale of the particular lot and the house, what was done then?

"A. The purchaser of the individual house obtained, through T. J. Bettes Company of California, a VA guaranteed loan or FHA insured loan which T. J. Bettes Company made, they created the permanent mortgage. From the proceeds of this permanent mortgage, the interim loan then was retired."

In the latter part of 1963, Julian Keith incorporated the Centers. He owned—with his wife—100% of the stock of both. They were licensed to do general contracting and subcontracting work. They did so for the partnerships and when they were paid for their work, they in turn paid their suppliers—at least they did so until March 1964 as an officer of Bettes who was the branch manager of the Phoenix office testified:

"Q. What was the situation in March of 1964?

"A. The situation was a financial breaking down of the Advanced Living Center. While being there physically in the offices maintained by Advanced Living Center, I was able to observe creditors just as suppliers. These suppliers, and so forth, that Advanced Living Center had been doing business with, would come into the office in order to discuss and obtain money on their unpaid bills for supplying materials and labor, and so forth, to Advanced Living Center."

Two months later when some of the officers of Bettes and Julian Keith met in California to discuss the possibility of shutting down the operations of the partnerships because they "had suffered substantial losses, and it appeared that these would do nothing but increase * * *," it was learned that the Centers were not paying their suppliers. One of the officers of Bettes who attended this meeting testified as follows:

"Q. As a result of this knowledge, did you or did you not change your method of paying directly to Advanced Living Center or Advanced Service Center?

"A. Yes, sir.

"Q. And in what manner did you change your method of operation?

"A. Well, each of the partnerships began making their payments to Advanced Living Center for work performed by them jointly to Advanced Living Center and a supplier of Advanced Living Center to be sure the money went where it should go."

In June of 1964, the Centers sent separate letters in care of T. J. Bettes Company to the partnerships demanding more than $28,000 for labor and materials invoiced.

through 29 May 1964. Ten days after the Centers sent these letters, Julian Keith turned over all of the stock he and his wife owned in the Centers to Jack Napier for the stated consideration of $2.00.

Napier testified that shortly after he received the stock from Keith, the United States Internal Revenue Service made an investigation of the books and records of the Centers. Although the I.R.S. did not serve a notice of levy upon the Centers, it did so serve Julian Keith and Bettes. The notice of levy served on Bettes stated that "all sums of money or other obligations owing from you to (the Centers) are hereby levied upon and seized for satisfaction of the aforesaid tax." Bettes responded by denying that it owed any money to the Centers.

On 22 September 1964, the attorney for the partnerships wrote a letter to the attorney for the Centers which stated in part:

"Subsequent to our conversation when Mr. Napier was present I have compiled a list of the Liens which have been filed against the houses for which Advanced Living Center, Inc. acted as Contractor. " * * * Although we have checked our records we do not have anything to show that the Lienors, Union Rock & Materials Corporation, Dunn-Edwards Paint Contractors, and Air Conditioning Supply Company have been paid on these jobs.

"The reason for notifying you of these Liens is so that you may have Mr. Napier check any records which he has. Additionally you probably have been advised that Cause Number 166121 has been filed in the Superior Court of this County by Union Rock & Materials Corporation against Advanced Living Center and numerous defendants seeking to foreclose its Mechanics Liens."

All of the liens to which the letter refers were filed during the month of July 1964 and totaled more than $14,000. They were all placed on lots in which the partnerships had an interest. More than ten days after the above letter was sent—the import of which is discussed, *infra*—the partnerships paid the liens, which were released.

On 4 May 1965, the Centers sued T. J. Bettes Company for $48,000 on an open account. Bettes responded by denying that it was indebted to the Centers for any amount, and, in the alternative, sought a set-off in the event an indebtedness was found. However, before the matter could be brought to trial, the partners in Advanced Homes and Parkcrest Advanced Homes—essentially Julian Keith and T. J. Bettes Company—agreed that Keith would transfer all of his interest in the partnerships to Bettes in return for its promise to pay the Internal Revenue Service $4,047.-93 and $6,398.36 (or a total of $10,446+),

"* * * thereby reducing by this amount the personal liability of (Keith) on the Levy based upon obligations arising from the operation of ADVANCED LIVING CENTER, INC. and/or ADVANCED SERVICE CENTER, INC."

Bettes fulfilled its promise on 27 May 1965 by issuing via the partnerships—which were now wholly owned by Bettes—two checks totaling $10,446+.

The trial court made the following findings of fact:

"1. That prior to June 18, 1964 the (Centers), through their former sole stockholder, Julian Keith, had acknowledged the amount of indebtedness owed to (the Centers) by PARKCREST ADVANCED HOMES, was $12,338.32, and by ADVANCED HOMES, was $11,700.84; and the Court finds these amounts owed to (the Centers) by (T. J. Bettes Company);

"2. That (T. J. Bettes Company), on behalf of PARKCREST ADVANCED HOMES and ADVANCED HOMES paid in excess of these amounts owed, for Liens placed by Suppliers and the Internal Revenue Service."

It then ordered that the Centers take nothing by reason of their complaint and that Bettes have judgment for its costs.

In response to the Centers' first contention that the trial court's second finding of fact is not supported by the evidence, we must say that their contention is little supported by their brief, for we find no reference therein to testimony or exhibits from which we could draw a conclusion contrary to that drawn by the trial court that Bettes had,

"* * * on behalf of PARKCREST ADVANCED HOMES and ADVANCED HOMES paid in excess of ($24,039.16), for Liens placed by Suppliers and the Internal Revenue Service."

Our own examination of the record reveals that when Napier testified, he categorically denied that the Centers paid off the liens filed by Union Rock & Materials, Dunn-Edwards and Air Conditioning Supply Company, although we do note that he did testify that the Centers did pay off some other liens filed by materialmen. The testimony of an officer of Bettes on the other hand, reveals that Bettes, on behalf of the partnerships, did in fact pay the Union Rock, Dunn-Edwards and Air Conditioning Supply Company liens, which, as previously noted, totaled more than $14,000.

With respect to the question of whether Bettes paid anything to the I.R.S., Exhibits 15 and 17 provide sufficient, competent evidence to support the trial court's conclusion that Bettes was the party who paid the tax liens, for the Exhibits are copies of cashier's checks made payable to the I.R.S. by the partnerships and they show that they were drawn on the partnership accounts after Keith transferred all interest he had in the partnerships to Bettes. The two checks total more than $10,400. Thus, simple addition supports the trial court's conclusion of an excess.

Nevertheless, the Centers argue that as a matter of law it was error for the trial court to allow Bettes to set off these amounts.

## THE MECHANICS' LIENS

Although the Centers place great reliance in the case of Bagaglio v. Paolino, 35 R.I. 171, 85 A. 1048 (1913), we are of the opinion that the question of whether Bettes was properly accorded a set-off for paying the liens filed by Union Rock, Dunn-Edwards and Air Conditioning Supply is controlled by Arizona's statutes concerning mechanics' liens. The Bagaglio case is distinguishable on its facts from the instant case. Moreover, the rule of law it enunciates simply provides the probable reason why a particular part of our own mechanics' lien statute was enacted, namely, to close the door to fraud, dishonesty and collusion between the materialman and the owner of the property upon which the lien has been placed. That statute is A.R.S. § 33–994 and it sets forth the procedure the owner is to follow when a materialman liens the owner's property. In the first part it provides:

"Upon service of the notice and claim of lien, the owner may retain, out of the amount due or to become due the original contractor, the value of the labor or material furnished as shown by the notice and claim of lien."

In the instant case, it was established that the partnerships owned the subdivision lots prior to the time any liens were filed (see the quoted testimony, *supra,* concerning the financing of the subdivisions). It was also established that a substantial amount of money was due the Centers from the partnerships at the time Union Rock, Dunn-Edwards and Air Conditioning Supply filed their liens. The partnerships were, therefore, permitted by A.R.S. § 33–994 to retain, "out of the amount due or to become due * * *" the Centers, the value of the labor or material furnished by the aforementioned lienors as shown by their liens. In our opinion, the permitted retention was accomplished by the partnerships when they did not pay the Centers' demand of $28,000 made in their (the Centers') letter of 9 June 1964. As

a consequence, the second half of A.R.S. § 33–994 came into play, namely:

"The owner shall furnish the original contractor with a true copy of the notice and claim of lien and if the contractor does not, within ten days after receipt of the copy, give the owner written notice that he intends to dispute the claim, he shall be considered as assenting to the demand, which shall be paid by the owner when it becomes due."

This provision, asserts the Centers, precludes the set-offs awarded by the trial court because the partnerships failed to "furnish (the Centers) with a true copy of the notice and claim of lien * * *." We are unable to agree.

■ As noted earlier, we think the purpose of this part of A.R.S. § 33–994 is to prevent fraud, dishonesty and collusion between the mechanic and the owner. It does so by putting the contractor on notice that if he does not indicate his intent to dispute the claim within ten days after he has knowledge thereof from the owner, he is deemed to have assented to the demand, "which shall be paid by the owner when it becomes due."

■ In the instant case, we are of the opinion that there was substantial (though not strict) compliance with the statutory requirement of notice when, on 22 September 1964, the partnerships advised the Centers by letter that Union Rock, and others, had filed mechanics' liens on the subdivision lots. This Court stated in Peterman-Donnelly Engineers & Contractors Corporation v. First National Bank of Arizona, 2 Ariz.App. 321, 408 P.2d 841 (1966):

"* * * [T]he lien statutes, being remedial, are to be liberally construed. (citations omitted.) Substantial compliance not inconsistent with the legislative purpose is sufficient. (citations omitted.)."

■ We hold that when the Centers did not respond to the partnerships' letter of 22 September 1964 within the ten days allowed by A.R.S. § 33–994 and that

when the partnerships thereafter paid the liens to which their letter referred, the partnerships were entitled to a set-off for the liens which the statute itself mandated that they pay. The set-off subsequently inured to Bettes:

"Where one partner acquires all the interests of the other partners and there is no longer a partnership, he may set off a credit of the partnership against his obligation as an individual." 20 Am.Jur.2d Counterclaim, Recoupment, Etc. § 126.

### THE TAX LIENS

We now turn to the Centers' contention that the trial court erred as a matter of law when it allowed Bettes a set-off for the monies it paid to the I.R.S. We do so mindful of the proposition of law enunciated in Land-Air, Inc. v. Parker, 103 Ariz. 1, 435 P.2d 838 (1968):

"* * * [W]e must affirm the trial court if 'we can on any reasonable view of the evidence deduce therefrom facts which, *on any theory of the law*, would sustain the judgment.' (citations omitted)." (Emphasis Supplied.)

The heart of the Centers' theory that Bettes should not have been accorded a tax set-off is the agreement executed by Keith and Bettes—in fact two agreements identical in terms except for amounts and certain parties—in which Keith transferred all interest he had in the partnerships of Advanced Homes and Parkcrest Advanced Homes to Bettes. The pertinent provisions provide:

"WHEREAS, (Keith is) personally liable on certain monies due the Internal Revenue Service by reason of (Keith's) ownership and operation of ADVANCED LIVING CENTER, INC., an Arizona Corporation, and ADVANCED SERVICE CENTER, INC., an Arizona Corporation; and

* * * * * *

"WHEREAS, Internal Revenue Service has served (Bettes) with a Notice of Levy in regard to delinquent taxes due

it from ADVANCED LIVING CENTER, INC. and ADVANCED SERVICE CENTER; INC.

\* \* \* \* \* \*

"NOW THEREFORE, for an (sic) in consideration of our mutual promises, it is agreed:

"1. (Keith does) hereby relinquish, transfer, quit claim, and assign to (Bettes) any and all interest (he has), or may have, in and to the (partnerships).

\* \* \* \* \* \*

"3. (Bettes) agrees to pay to the Internal Revenue Service the sum of ($10,-446.29), thereby reducing by this amount the personal liability of (Keith) on the Levy based upon obligations arising from the operation of ADVANCED LIVING CENTER, INC. and/or ADVANCED SERVICE CENTER, INC.

\* \* \* \* \* \*

"5. All parties recognize that the entire issued Capital Stock of ADVANCED LIVING CENTER, INC. and of ADVANCED SERVICE CENTER, INC. has been transferred by (Keith) to JACK NAPIER."

The Centers argue that neither the agreements nor the evidence explains why Keith's "personal liability to the Internal Revenue Service was a debt of the (Centers) which (Bettes) could pay and then charge (the Centers) without (the Centers') consent." We cannot agree. First, the agreements affirmatively state that Keith's personal tax liability arose "by reason of (Keith's) ownership and operation of * * *" the Centers. In addition, this testimony by an officer of Bettes appears in the reporter's transcript and it was not objected to by the Centers:

"Q. First handing to you Exhibit 32 in evidence (i. e., one of the agreements), calling your attention to the paragraph here on the first page: 'whereas, Internal Revenue Service has served (Bettes) with a notice of levy in regard to delinquent taxes due it from Advanced Living Center, Inc.,

and Advanced Service Center, Inc.'; is that correct?

"A. That is correct.

"Q. And then was that, or is it stated therein that it was paid for the benefit of Advanced Service Center and Advanced Living Center?

"A. Yes, sir.

"Q. And do you know what those taxes were for?

"A. Yes, sir.

"Q. The levied taxes?

"A. Yes.

"Q. What were they?

"A. They were for non-payment of Advanced Living Center of withholding and FICA from its employees.

"Q. And that was to both corporations; is that correct?

"A. Yes.

"Q. And do you know that the law is that a withholding and the social security withholding taxes are a personal liability of the officers of a corporation?

"A. Yes, I am aware of that.

"Q. And there was discussion at that particular time in regards to that matter (i. e., at the time the agreements were executed)?

"A. Yes.

"Q. In other words, this was not income taxes owed by Mr. Keith, were they?

"A. No.

"Q. It was for withholding taxes and social security taxes collected by—

"A. Advanced Living Center.

"Q. And Advanced Living Center and Service Center, which was not paid to the IRS?

"A. Yes.

"Q. And they were holding Julian Keith personally responsible?

"A. Yes.

·"MR. PAIN (Centers' Attorney: The agreement speaks for itself. They levied on Keith."

In our opinion, these facts support ·a theory of law upon which we must affirm the trial court. LAND-AIR. The monies which Bettes paid to the Internal Revenue Service at the time it owned all ·of the assets of the partnerships of Advanced Homes and Parkcrest Advanced Homes, and in fulfillment of its promise in the agreements, operated to reduce a joint and several tax liability of Julian Keith and the Centers. Bettes was entitled to set off the amount it paid to the I.R.S. against the indebtedness it owed to the Centers. We agree with the statement in 20 Am.Jur. 2d Counterclaim, Recoupment, Etc. § 7 that "natural justice and equity require ·that the demands of parties mutually indebted be set off against each other * *."

· Affirmed.

DONOFRIO, P. J., and CAMERON, J., ·concur.