508 P.2d 59

**Mary BECCHELLI, Appellant,**

v.

**Domenic BECCHELLI, Appellee.**

**No. 10938–PR.**

Supreme Court of Arizona,
In Banc.

March 22, 1973.

Rehearing Denied April 17, 1973.

**230**

Edward E. Selden, Phoenix, for appellant.

Otto H. Linsenmeyer and Frank E. Dickey, Jr., Phoenix, for appellee.

STRUCKMEYER, Justice.

This matter comes to us on a motion for review of an opinion of the Court of Appeals, Department B, which affirmed in part and reversed in part a decree of divorce. Opinion of the Court of Appeals, 17 Ariz.App. 280, 497 P.2d 396 (1972), approved as supplemented herein.

Since every question raised on this appeal is dependent upon the facts of the case, consistent with our invariable rule the evidence will be stated in the light most favorable in support of the judgment of the trial court.

Domenic Becchelli and Mary Becchelli were married in Phoenix, Arizona on October 19, 1966. Both parties were elderly, although Mary was some years younger than Domenic. He had retired in 1960, had a small pension and social security, and had accumulated a small estate in Colorado and Indiana. He came to Arizona with his former wife and acquired a home in joint tenancy with right of survivorship, which passed to him at the time of her death. He had children by this former marriage. In the course of the instant marriage, which lasted a little over three years, Domenic invested and re-invested funds from his separate estate in properties in Arizona. The re-investments of separate funds were usually, but not invariably, made in the joint names of himself and his wife.

At the time of marriage, Mary was in debt. She had possibly $200.00 in cash, which she kept on her person, and a new Buick automobile on which she had made two payments and on which she made the payments when she worked. She worked for about one year after the marriage. Separate income tax returns were filed by Mary for the three years of the marriage in order to take advantage of losses in investments she had incurred prior to marriage. The evidence does not establish any significant commingling by Domenic of his separate property with that of her community earnings.

In 1969, Domenic brought this suit for divorce, and Mary counterclaimed for separate maintenance. The trial court awarded Domenic a divorce, finding that Mary had been guilty of excesses and cruel treatment in constantly arguing with Domenic and inducing him to use his separate funds to enhance her estate.

A reading of the transcript of testimony of the trial convincingly establishes that Mary entered this marriage with the principal objective of obtaining security and strongly suggests that she constantly harassed Domenic in attempting to induce him to change the character of his separate property to joint ownership. The entire record of their married life tends to support the court's finding, but several examples from the testimony are specifically noted. At one time during the course of the marriage, Domenic took $5,000.00 of his separate funds and placed it in a joint account with a son by his first marriage. Domenic testified concerning this:

"Q When she saw that, what did she say to you?

A She just raised the roof; why all to the son? Why not me?"

Mary's testimony corroborated Domenic. She told the court that before their marriage he promised to give her the home which he and his former wife had acquired and in which Mary and Domenic lived after their marriage:

"Q Just one minute. Tell me what promise was made.

A Before we got married the promise was made that he would give me the house.

* * * * * *

Q Now, was that statement ever repeated at a later date?

A. Oh, yes.

Q How many times?

A Hundreds of times. Any time I asked.

Q And then I will ask you if there was any specific time that you can remember that he made that statement?

A The specific time was when I signed the contract that he sold the house [in Indiana] for six thousand and some dollars. I told him that I wouldn't sign that paper unless he keep the promise on the house and the rest of the things * * *."

Mary urges that the trial court erred in setting aside certain property to Domenic on the grounds, first, that there was not sufficient evidence to show that the funds which went into these properties were the separate property of the plaintiff.

Mary testified concerning the house located at 3820 W. Avalon, taken by a joint tenancy deed with right of survivorship, that Domenic made the down payment of $500.00 from his separate funds, and that after its acquisition the property was rented for $100.00 a month. The rental payments came by checks payable to both Domenic and Mary. She endorsed the checks and he then made the mortgage payments of $77.00 a month.

Mary complains of a mortgage taken in their joint names on property described as Lot 42, Arizona Rancheros, which the court decreed was Domenic's sole and separate property. As to this, Domenic testified that money from the sale of separate property in Colorado was used to make a loan of $2,000 secured by a note and mortgage payable to himself and Mary with right of survivorship.

Mary complains of the disposition of certain property in Yuma County. Domenic accepted a deed which transferred the property to the parties as tenants in common. Mary was asked:

"Q Well, that is separate funds, that $5,000?

A The $5,000, yes.

Q And where did that $5,000 come from?

A Well, you ask him that. I don't—

Q I am asking you, Ma'am.

A *I don't know.*

Q You don't know?

A *No, I know that nothing.*

* * * * * *

Q You don't know of any money taken out of this book to pay for the property that was up there, located in Yuma County, is that right?

A Yuma County?

Q Yes.

A The first I heard, the first part of the money that he gave, $5,000, he say he pay $6,000, I don't know. I don't know how much he gave for, $4,00 [sic] or something. It was first done, I didn't see the book [bank passbook].

*    *    *    *    *    *

Q You seem to know quite a bit about this transaction so tell the Court what money was paid, how many payments were made to make up this $12,000?

A Well, the first part of it was a deposit of $500.

Q Where did that come from?

A *I don't know where he got.* He is the one that just answers your questions.

Q What is the next item of payment?

A The next item was, let me see, seven, I think $5,000.

Q Where did that come from?

A Ask him.

Q All right. The next item of payment?

A The next item of payment, 7,000 something in the vicinity that he gave the mortgage. Sold the mortgage to a friend of his. The second payment, the last part, but the first part it could have been my money.

Q It could have been?

A *I don't know. I don't know.* You ask him that." (Emphasis supplied.)

The plaintiff, Domenic, testified:

"Q This property you bought in Yuma your wife testified cost $12,000?

A Yes, that's right.

Q O. K. Now, that was paid by certain means, was it not?

A I paid, I got $4,000 from the east.

*    *    *    *    *    *

Q And how much credit did you get for that mortgage? Or did you borrow money—

A. I borrowed the money to this fellow. I gave him that mortgage for the transaction.

Q O. K. You borrowed how much from him?

A Eight thousand dollars.

Q Was that the other part of the $12,000?

A Yes.

*    *    *    *    *    *

Q All right. Then all that went into the Yuma property was your money?

A That's right."

We think the evidence is sufficient to establish that these properties were acquired from the separate funds of the plaintiff.

██ Mary next urges that the court erred in setting aside these properties to Domenic as his sole and separate property for the reason that the evidence wholly fails to rebut the presumption of a gift of one-half interest in the properties to her. The facts substantiate her position. As stated, both parties were elderly and the marriage was entered into rather hastily, being about two weeks after they first became acquainted. It was seemingly understood that he would take care of her. She testified:

"* * * he told me, I should work, he'd give me security and things."

██ It is the general rule of law that where property is paid for by one and taken in the name of another or jointly in both their names, a presumption arises that the property was taken in trust for the benefit of the one paying for the property. But as between husband and wife, the presumption as to real property is to the contrary. The law presumes a gift from the husband resting upon the proposition that the husband is discharging his legal duty to provide support for his wife. The decisions recognize that this is a rebuttable presumption, with some courts holding that evidence to rebut the presumption of a gift must be clear and convincing. Osuch v.

Osuch, 146 Conn. 90, 148 A.2d 138 (1959); Walker v. Walker, 369 Ill. 627, 17 N.E.2d 567 (1938), *cert. denied,* 306 U.S. 657, 59 S.Ct. 774, 83 L.Ed. 1054 (1939); Frank v. Frank, 335 Mass. 130, 138 N.E.2d 586 (1956); Alexander v. Alexander, 44 S.W. 2d 872 (Mo.App.1932); Lewis v. Bowman, 113 Mont. 68, 121 P.2d 162 (1942), *overruled on other grounds,* Cook v. Cook, 495 P.2d 591, 593 (Mont.1972); Peardon v. Peardon, 65 Nev. 717, 201 P.2d 309 (1948); Carberry v. Carberry, 137 N.J.Eq. 9, 43 A. 2d 215 (N.J.Chancery Ct.1945); Hall v. Bone, 210 Or. 98, 146–148, 309 P.2d 997 (1957); Christy v. Christy, 353 Pa. 476, 46 A.2d 169 (1946).

Nor is Arizona an exception to the rule. In Blaine v. Blaine, 63 Ariz. 100, 159 P.2d 786 (1945), a case in which the husband purchased property with his separate funds and took the title jointly with his wife, we said:

"The defendant had the right to use this method in making a gift of one-half of the property to plaintiff." 63 Ariz. at 111–112, 159 P.2d at 791.

We also said:

"The presumption that a conveyance so taken constitutes a gift may be rebutted. The burden of proof is upon the husband to establish a resulting trust rather than that the transaction amounted to a gift. This can only be done by evidence showing a clear intention of the trust." 63 Ariz. at 112, 159 P.2d at 791.

Domenic did not at any time say that he did not intend to give an interest in these properties to Mary, and there is no evidence whatsoever in this case that Domenic intended by these conveyances to do other than provide for his wife when he took title jointly with her. That he may have been incautious or imprudent is not the concern of the court. Nor may a court set aside a transaction merely because one or the other to a marriage contract has made a poor bargain.

Prior to 1962, by A.R.S. § 25–318, subsec. A, the Superior Court on dissolution of a marriage was required to:

"order such division of the property of the parties as to the court seems just and right, according to the rights of each of the parties and their children, without compelling either party to divest himself or herself of title to separate property."

Under this language, it has long been held that a divorce court is without jurisdiction to award either party the separate property of the other. Schwartz v. Schwartz, 52 Ariz. 105, 109, 79 P.2d 501, 503, 116 A.L.R. 633, 636 (1938); Brown v. Brown, 38 Ariz. 459, 463, 300 P. 1007, 1008 (1931).

In 1962, the Legislature added this clause to § 25–318, subsec. A, supra:

"except that as to property held by the parties either as joint tenants with right of survivorship, as tenants in common, or as tenants by the entirety, the court may in the same action, on its own initiative or on petition of either party, order division of such property, or enter an order directing partition of such property * * *."

In Needel v. Needel, 15 Ariz.App. 471, 489 P.2d 729 (1971), Division Two of the Court of Appeals held that the 1962 amendment empowered the Superior Court in a divorce proceeding to divide property held by the parties as joint tenants with right of survivorship, as tenants in common, or tenants in entirety in the same manner as community property,—that is, as to the court seems just and right. Thereafter, in Saxon v. Riddel, 16 Ariz.App. 325, 493 P.2d 127 (1972), Division One of the Court of Appeals came to a contrary conclusion; namely, that where there was separate property of the parties to a divorce proceeding, the amendment only permitted the court to enter a judgment in the divorce proceeding dividing or partitioning their jointly held property.

We do not agree with the construction placed upon § 25–318 as amended in Needel v. Needel. A reading of the original statute together with the amendment discloses no ambiguity arising out of the language used. The statute before amendment only directed that the court on enter-

ing a judgment of divorce order such a division of community property of the parties as it deems just and right without compelling either party to divest himself of title to separate property. The amendment of 1962 simply empowered the divorce court to, in the same action, either partition or divide the joint property. *But* we think it significant that the words were retained requiring the court to do so "without compelling either party to divest himself or herself of title to separate property." Any apparent ambiguity is resolved when it is understood that the title which is the evidence of ownership is joint but that the legal consequence is that each has a separate estate or interest. Collier v. Collier, 73 Ariz. 405, 411–412, 242 P.2d 537, 541 (1952).

We conclude that the amendment is a procedural device which permits the court to settle all rights in the property of the parties to the divorce in one action, and find nothing in the language of the amendment which gives the Superior Court the authority to divide as seems just and right jointly held property.

Nor do we find anything in the language of Nace v. Nace, 104 Ariz. 20, 448 P.2d 76 (1968), relied on by the court in Needel v. Needel, supra, to suggest the contrary. *Nace* was a case of an asserted commingling of separate property with community which the wife urged destroyed its identity as the husband's separate estate. We said:

"The issue before this Court is whether the trial court made a proper division of the community property. In deciding this question, the trial court first had to determine what was separate property and what was community property, and then make an equitable distribution of the *community* property." 104 Ariz. at 22, 448 P.2d at 78. (Emphasis supplied.)

We found that the facts supported the husband's claim that the commingling was not sufficient to stamp the whole of his property with community status and held that the division of the community property by the trial court was just and equitable. So much of the opinion in Needel v. Needel, 15 Ariz.App. 471, 489 P.2d 729 (1971) as is contrary to the views herein set forth is expressly disapproved.

We find no merit in the assertion that the court erred in failing to grant a new trial on the grounds of newly discovered evidence.

Since we have concluded that the court erred in setting aside to the plaintiff, Domenic Becchelli, the property we have herein discussed as his sole and separate property, and since there may be other property which is affected by this decision and by the decision in O'Hair v. O'Hair, 109 Ariz. 236, 508 P.2d 66 (1973), the court below is directed to vacate its judgment except insofar as that part granting to Domenic Becchelli a divorce, and is further directed to reconsider all of the property interests, both separate and community, of the parties and upon doing so to enter an appropriate judgment in accordance with views expressed herewith.

CAMERON, V. C. J., and LOCKWOOD, J., concur.

HAYS, Chief Justice (specially concurring):

I concur with the result and differ only as to the language which supports the holding in O'Hair v. O'Hair, 109 Ariz. 236, 508 P.2d 66 (1973).

HOLOHAN, Justice (dissenting).

While generally concurring with the result reached by the majority to send this case back to the trial court for proper disposition of the real property, I disagree with the directions given to the trial court to divide the property according to the construction placed on A.R.S. 25–318 by the majority.

I agree with the position taken by Division Two of the Court of Appeals in Needel v. Needel, 15 Ariz.App. 471, 489 P.2d 729 (1971). In the cited case the Court of Appeals stated:

".  .  . we believe that the legislature recognized the widespread practice in the State of Arizona of putting property in joint tenancy with the right of survivorship in order to avoid the expense and delay of probate proceedings. The language of the statute as amended clearly indicates to us that the legislature intended that the court should be able to exercise the same powers over joint tenancy property as it exercises over community property." 15 Ariz.App. at 474, 489 P.2d at 732.

Due to the widespread use of joint tenancy both personal and real property is often placed in joint tenancy with little consideration of the legal effects caused by such form of ownership. Prior to the 1962 amendment the statute clearly forbade the court from dealing with property other than community property. In Collier v. Collier, 73 Ariz. 405, 242 P.2d 537 (1952), this Court held that married persons who placed property in joint tenancy had destroyed the community nature of the property and had created separate property. Being separate property, this Court held, that in a divorce action the superior court had no authority to compel either of the parties to divest himself or herself of their interest in that separate property. The 1962 amendment to A.R.S. 25–318, subsec. A changed the statute so that the superior court did have jurisdiction to divide jointly owned property of the parties in a divorce action or to partition such joint property as otherwise provided by law. The majority takes the view that the statute is procedural and the provision for division means an equal division. Regretfully, this Court had the opportunity in 1971 to correct the holding in Needel v. Needel, supra, but petition for review was denied which, while we may disavow it, is generally construed

by many in the legal profession and in the courts as tacit approval of the holding.

The majority contends that the amendment was merely a procedural device. It certainly was not necessary for the legislature to create a procedural device because of any special need. In Collier v. Collier, supra, this Court stated:

"We know of no reason why the general statutory provisions relating to partition, . . . are not available to the parties in a divorce action. Since the court in such a proceeding may not compel either party to divest himself or herself of the title to separate property, it must necessarily have resort to an action in partition to sever the separate interests in the joint tenancy property, and we hold that actions for divorce and actions for partition, both being equitable proceedings, may be joined in one complaint and should be stated in separate counts." 73 Ariz. at 414, 242 P.2d at 542.

Thus at least ten years before the amendment it was recognized that a division of the joint property could be achieved by combining the action for division of the separate property as a separate claim with a claim for divorce.

In at least two cases after the 1962 amendment this Court had occasion to comment on the amendment. In each instance this Court treated the 1962 amendment as involving a substantive change of law rather than a procedural device. It is true that the comments concerning the 1962 amendment were dicta, but it does add weight to the position that cases heard by this Court within a few years of the amendment showed that this Court viewed the 1962 amendment as involving a substantive change in the method of holding and dividing property in a divorce case, and that by reason of that change this Court was carefully examining the date of acquisition of the property in question so that there was no retrospective application of the 1962 amendment to property acquired prior to that date. If this Court

**236**

had felt that the 1962 amendment was purely procedural there would have been no need for such care and caution since the legislature could give retrospective effect to procedural statutes. See Headley v. Headley, 101 Ariz. 331, 419 P.2d 510 (1966) and DeMarce v. DeMarce, 101 Ariz. 369, 419 P.2d 726 (1966).

In my view the 1962 amendment effected a substantive change in the law of property, and married couples who took property in joint ownership as joint tenants, as tenants in common, or as tenants by the entirety took such property subject to the power of a court in a divorce action to order a division of that property in the same manner as community property. As with Division Two of the Court of Appeals I believe that the widespread use of joint tenancy ownership necessitated the 1962 amendment to provide an equitable means of dividing such property in the event of divorce, and that by considering such joint ownership property as similar to community ownership the amendment did give to the superior court the opportunity to make an equitable distribution of all the property even though some of the property would be in the category of separate property rather than community. In my judgment this was the very purpose of the exception. The court could not divest a person of separate property before 1962, but after 1962 the court may not divest a person of separate property except the listed forms of joint ownership and as to these the court may divide the property in the same fashion as the community property. If the legislature had meant that the court may divide the property equally they could have easily said that, but they didn't. The legislature did provide in the same section that the partition method elsewhere set forth in the code could be used.

Our task is to find the intent of the legislature at the time of the enactment of the amendment. In my view our earlier statements nearer to the time of the enactment are most persuasive, and I would adopt the construction of the amended statute set forth in Needel v. Needel, supra.