526 P.2d 762

Ernest Albert OPPENHEIMER, Appellant and Cross-Appellee,

v.

Shirley OPPENHEIMER, Appellee and Cross-Appellant.

No. 2 CA–CIV 1600.

Court of Appeals of Arizona, Division 2.

Sept. 23, 1974.

Rehearing Denied Oct. 22, 1974.

Review Denied Nov. 19, 1974.

S. Leonard Scheff, Tucson, for appellant and cross-appellee.

Lesher & Scruggs, P. C. by Monte C. Clausen, Tucson, for appellee and cross-appellant.

## OPINION

HOWARD, Judge.

Three questions are raised on this appeal regarding the dissolution of the marriage of Ernest and Shirley Oppenheimer. As posed by Ernest, they are:

"[1] IS THE AWARD OF SPOUSAL MAINTENANCE IN THE SUM OF $400 PER MONTH FOR 15 YEARS PLUS $75 PER MONTH FOR TWO YEARS EXCESSIVE AFTER A MARRIAGE OF 28 [SIC] MONTHS?

■ WAS EVIDENCE OF THE HUSBAND'S RELATIONSHIP WITH ANOTHER WOMAN AFTER SEPARATION WRONGFULLY ADMITTED INTO EVIDENCE OVER HUSBAND'S OBJECTION?

■ DID THE TRIAL COURT HAVE JURISDICTION TO GIVE THE WIFE THE RIGHT TO LIVE IN THE FAMILY HOME WHICH WAS HELD IN JOINT TENANCY, FOR 15 YEARS, THEREAFTER TO BE SOLD AND DIVIDED BETWEEN THE PARTIES?"

Shirley filed a cross appeal raising two issues which can be dealt with after a brief factual review. More details will be discussed in relation to the issues raised by Ernest.

The Oppenheimers were married on December 21, 1968. Two children were born to Shirley and Ernest, one in September of 1970 and the other in January, 1972. After about forty months of marriage, the Oppenheimers separated. A complaint for divorce was filed by Shirley against Ernest on April 16, 1973. When the case came up for a hearing on October 25, 1973, the pleadings were amended to conform to Arizona's revised marriage dissolution law. At the end of the hearing, the judge ordered that Ernest pay Shirley $350 a month per child for child support and $75 per month for two years or until Shirley remarried, whichever occurred first, for spousal maintenance. The court further ordered "that the house . . . present-ly held by the parties as . . . joint tenants shall be used by the plaintiff as long as it continues to be used as a home for the plaintiff and the children, or until the youngest child becomes eighteen, whichever comes first. Then the property shall be sold by the parties and any money remaining after paying mortgages or liens against the property shall be divided equally between the parties." After the court announced its judgment, Ernest's attorney began to explain the tax consequences of the judgment, whereupon the following exchange took place:

"MR. CLAUSEN: Let me ask before you continue, as I understand it an order has been entered, and it seems rather inappropriate to be arguing at this time.

THE COURT: Maybe it would [be] better to hear each of you now than to hear it at a motion for new trial a week from now."

After hearing the arguments, the court said, "I'll leave it the way it is, and if you want to make a motion on it and go into further detail, you can."

Neither a timely motion for a new trial nor a timely objection to the form of judgment was filed. Instead, Ernest filed a "motion to set aside judgment and for reconsideration" on December 11, 1973. A hearing was held on the motion on December 24, 1973, at which time Ernest presented an affidavit prepared by a certified public accountant concerning the tax consequences of the court's decree. As a result of the hearing, an amended decree was entered on January 2, 1974, which provided for child support of $150 per month per child and spousal maintenance of $475 per month for the first two-year period, $400 per month for thirteen years thereafter and $200 per month for two years thereafter, which payments would be terminated on the death or remarriage of Shirley.

■ Shirley's cross-appeal alleges that the court erred in hearing Ernest's motion for reconsideration and in considering further evidence in connection therewith. We can accept neither argument. Pursuant to

section 6 of Rule 60(c), 16 A.R.S., the court had the power to "relieve a party or his legal representative from a final judgment, order or proceeding for . . . any other reason justifying relief from the operation of the judgment." In view of the apparent confusion resulting from the court's immediate post-decree consideration of its terms, we regard this case as appropriate for a motion under Rule 60(c)(6). *Compare,* Burkhardt v. Burkhardt, 109 Ariz. 419, 510 P.2d 735 (1973); Black v. Greer, 17 Ariz.App. 383, 498 P.2d 225 (1972); Burdick v. University of Arizona, 16 Ariz.App. 329, 493 P.2d 131 (1972). Nor is Shirley's second contention well-taken. The only objection to consideration of further evidence was made in reference to the affidavit of the certified public accountant. The substance of the affidavit had already been explained by Ernest's attorney; no objection was raised at that time. Thus, even were we to rule that the court could not consider the affidavit, the same facts were presented to the court during counsel's argument and the court could consider those facts. See, Annot. 1 A.L.R.3d 6, 44 (1965). We proceed to Ernest's three arguments none of which we find convincing.

## THE AWARD OF SPOUSAL MAINTENANCE

Ernest admits that Shirley is entitled to an award of spousal maintenance. He argues, however, that the award is excessive and does not encourage Shirley to seek employment. Our review is necessarily limited. "Where there is a conflict in the evidence and there is reasonable evidence to support the judgment of the trial court we will not disturb the judgment of the trial court." Burkhardt v. Burkhardt, 109 Ariz. 419, 420, 510 P.2d 735, 736 (1973). The parameters within which the trial court must operate are set out in A.R.S. § 25-319 (Supp.1973):

\*    \*    \*    \*    \*    \*

"B. The maintenance order shall be in such amounts and for such periods of time as the court deems just, without regard to marital misconduct, and after considering all relevant factors, including:

1. The financial resources of the party seeking maintenance, including marital property apportioned to him, and his ability to meet his needs independently.

2. The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment.

3. The standard of living established during the marriage.

4. The duration of the marriage.

5. The age and the physical and emotional condition of the spouse seeking maintenance.

6. The ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance.

7. Excessive or abnormal expenditures, destruction, concealment or fraudulent disposition of community, joint tenancy and other property held in common."

This provision was modeled after the Uniform Marriage and Divorce Act, § 308. Its purpose is:

" . . . to encourage the court to provide for the financial needs of the spouses by property disposition rather than by an award of maintenance." 9 Uniform Laws Annot. 494, Uniform Marriage and Divorce Act § 308, Commissioner's Note. The goal is to individualize decrees of dissolution, thus placing the burden on the parties to present the court with all relevant evidence. Analyzing each factor, we hold that there was ample evidence to support the court's award.

With reference to Shirley's financial resources, Ernest places much stress on her two masters' degrees, one in Spanish and one in English as a second language. It was estimated that if she were employed in her chosen field in Tucson, she could ex-

pect to earn $8,000. Yet there was also testimony that job opportunities in Tucson were "quite limited". The court could well have found that Shirley's earning potential, while great, was too speculative. Particularly is this true where the evidence indicated that Shirley did not intend to seek full-time employment until both children were enrolled in school. A court is ill-equipped to predict employment possibilities two or three years in the future. A modification hearing is better adapted to that purpose.

Admittedly, little or no time is necessary for Shirley to acquire the education needed in her field. But no one factor is conclusive in measuring the amount of maintenance. Facts which mitigate the importance of this consideration are that Shirley desires to stay at home with her children until they are old enough to attend school and that the job market in Shirley's fields is limited now, not to mention what they may be in the future.

The third guide for the trial court is the standard of living established during the marriage. In this connection, the evidence clearly supports the award of maintenance. Shirley presented evidence that her expenses averaged approximately $819 per month over a fourteen-months' period. This figure did not include mortgage payments on her residence for which she became obligated under the court's decree. Ernest's attack in this connection is based upon the assumption that Shirley works part-time and earns between $200 and $300 per month. Yet the record is clear that Shirley entertained no such intention. Nor does the law require her to work where she has pre-school children. A.R.S. § 25–319(A)(2) (Supp.1973) specifically requires the court to consider whether the parent is "the custodian of a child whose age or condition is such that the custodian should not be required to seek employment outside the home" in determining whether to award spousal maintenance. While mathematical precision is not required, the allocation of $475 for spousal maintenance

approximates the portion of monthly expenses attributable to Shirley. For example, if ⅔ of the monthly grocery and house and utility expenses and ½ of the medical and clothing expenses were allocated for child support (a reasonable estimate, in view of the evidence, which equals $300.-65) the remaining expenses would easily consume Shirley's spousal maintenance.

■ Ernest makes much of the fact that the marriage had "effectively" lasted only forty months. While the length of the marriage is an important consideration, its importance stems from two underlying and related considerations: The contribution of the spouse to be supported and judicial resistance to awarding spousal maintenance to a "golddigger". *See,* Annot. 1 A.L.R.3d 6, 32 (1965). Neither of these underlying factors are present to alter our judgment to affirm the award. Likewise, there is no evidence as to the age and the physical or emotional condition of Shirley which would make us believe that the court below abused its discretion.

Finally, the evidence is uncontradicted that Ernest would be able to meet his needs while he made the necessary child support and spousal maintenance payments. No evidence was presented regarding his expenses. His gross salary was $16,000 annually. In addition, he received $1,414 each quarter from a trust fund. The net result of the decree, as explained by Ernest's counsel at the hearing on the motion to reconsider, is that "she would end up with $11,000 almost exactly a shade over $11,000 which is net spendable after taxes, and Mr. Openheimer [sic] just a shade over $10,000 net spendable." (The estimate of Shirley's spendable income included $2,500 income from part-time jobs.) Absent some unusual circumstances, it would appear that the court considered Ernest's ability to pay, provided him with an adequate net income and did not abuse its discretion.

The cases cited by Ernest either are not controlling or have been cited for a proposition completely opposite to the actual

holding. O'Connor v. O'Connor, 16 Ariz. App. 599, 494 P.2d 1344 (1972) has been cited to us as proof that the award in this case was clearly excessive. Yet in that case, in addition to the award of $300 monthly alimony, the court also awarded the 53 year-old, possibly unemployable wife possession of the family home (It does not appear whether she was responsible for the mortgage payments.) and $6,582.83 from a credit union account, more than three times the amount in Shirley's bank account. Nor do we believe that Williams v. Williams, 19 Ariz.App. 544, 509 P.2d 237 (1973), establishes that the judge in our case abused his discretion. In the *Williams* case, evidence was presented regarding the husband's expenses and that he earned almost 20% less than Ernest earns.

■ Much reliance is placed on In re Rosan, 24 Cal.App.3d 885, 101 Cal.Rptr. 295 (1972). We accept Ernest's position that California law is instructive in interpreting our new marriage dissolution law. The Uniform Marriage and Divorce Act, upon which Arizona's law is patterned, is based on the spirit expressed in California dissolution law. 9 Uniform Laws Annotated 457, Commissioners' Prefatory Note (1973).

Appellant claims that *Rosan* stands for the proposition that only in a marriage of long standing can the court grant continuing spousal maintenance and that the court should encourage the wife to seek gainful employment by limiting the length of spousal maintenance. We do not agree. In *Rosan* the trial court provided for automatic reduction of spousal maintenance in order to encourage the wife to seek employment and avoid future modification hearings. The appellate court, while recognizing that the purposes of the trial court were worthy, held the judgment invalid since it was based upon mere hopes and speculative expectations and not upon the evidence. As the court stated:

"Here, the evidence is that Wife was not employed during the marriage except for a very brief period; there was no evidence that she had experience, training or education to qualify her for suitable employment; she was not employed at the time of trial and, indeed, was just about to undertake a course of instruction in real estate and some college courses to prepare herself for employment. Under these circumstances her future earnings and earning capacity were completely unknown, and such unknown future developments are better left to modification proceedings which have been provided for that very purpose, than to automatic reduction provisions operative one and two years, respectively, in the future.

\*    \*    \*    \*    \*    \*

Much of what we have said in reference to those portions of the support order hereinabove considered is applicable also to that part of the judgment ordering absolute termination of spousal support at the end of three years." 24 Cal. App.3d at 896–897, 101 Cal.Rptr. at 303.

■ The Court in *Rosan* recognizes that the trial court may order the termination of all spousal maintenance in a *Rosan*-type situation after the end of a specified number of years if the court also reserves jurisdiction to extend the period should hopes and expectations prove to be unfounded. Such an order would make it incumbent upon the wife to petition the court for continuance of the support and place upon her the burden of proving justification for an extension. But, *Rosan* does not mandate such an order. Rather, the court may enter a continuing order of support and place the burden upon the husband to petition for modification.

■ As far as the propriety of the court's granting spousal maintenance over a seventeen-year period, we note that the period extends approximately to the eighteenth birthday of the youngest child. Thereafter, all spousal maintenance ceases. As is recognized by the court in *Rosan*, our new divorce laws do not constitute some sort of legislative mandate to the

courts to relieve husbands of any long, continuing obligation for spousal support.

█ The amount of spousal maintenance awarded was not excessive. Nor was the failure to order a substantial change in support unreasonable where the evidence regarding future employment opportunities would have to be based on "mere hopes or speculative expectations." If those hopes or expectations attain a greater degree of certainty, there is nothing to prevent Ernest from seeking a modification of the award.

## EVIDENCE OF EXTRA-MARITAL RELATIONSHIP

At the dissolution hearing, evidence was introduced over counsel's objection that Ernest had traveled to Europe and was sharing an apartment with another woman. Ernest has raised this issue for four reasons:

"a. In light of the decree handed down it may help explain to the Court why so much money was awarded to the wife.

b. The case may well be returned for retrial and instructions on this point will be helpful.

c. Under the new law, fault is not an issue in a divorce case and old habits are hard to break.

d. There is only a presumption that the Judge has ignored the erroneous evidence and examination of this issue may help to determine that the Court has either not ignored that evidence or has abused its discretion in making the award."

█ It is true that fault is not an issue in granting dissolution. Fault has only limited relevance in awarding spousal maintenance, disposition of property, and child support. It should only be considered to the extent that there are "[e]xcessive or abnormal expenditures, destruction, concealment or fraudulent disposition of community, joint tenancy and other property held in common." We confess that the evidence admitted was probably outside the

boundaries of relevancy, but because we found no abuse of discretion in the court's judgment, we must conclude that this erroneous evidence was ignored. *See,* Advanced Living Center v. T. J. Bettes Co., 11 Ariz.App. 336, 464 P.2d 656 (1970).

## DIVISION OF JOINT TENANCY PROPERTY

█ The final decree of dissolution ordered as follows:

" . . . that the real property presently held by the parties as joint tenants shall be used by the Petitioner so long as it continues to be used as a home for the Petitioner and children, or until the younger child becomes 18, whichever comes first, then the property shall be sold by the parties and any money remaining after paying any mortgage or liens against the property shall be divided equally between the parties."

The arguments of both parties have referred us to the recently amended provisions of A.R.S. § 25–318 (Supp.1973). Because the real property involved was acquired before the amendment was enacted we cannot apply its terms. Our courts were faced with a similar problem following the 1962 amendment to § 25–318. In Headley v. Headley, 101 Ariz. 331, 419 P.2d 510 (1966) and DeMarce v. DeMarce, 101 Ariz. 369, 419 P.2d 726 (1966), our Supreme Court was faced with the question of whether the 1962 amendment applied to a division of property acquired before its enactment. In each case the court held that it did not.

"The 1962 amendment to A.R.S. § 25–318, subsec. A gives the court, in a divorce case, jurisdiction over the division of the property held by the spouses in joint tenancy; however in the instant case the property was acquired before the adoption of the 1962 amendment and is not affected by this amendment. Headley v. Headley, supra." DeMarce v. DeMarce, supra at 371, 419 P.2d at 728.

Thus, we must decide whether the court's disposition in which title remained in joint tenancy, but sole possession was awarded to Shirley, was within its jurisdiction and whether Ernest is entitled to any remuneration for his loss of possession. We conclude that the property settlement was within the court's jurisdiction. In Becchelli v. Becchelli, 109 Ariz. 229, 508 P.2d 59 (1973), our Supreme Court held that the superior court had no "authority to divide as seems just and right jointly held property." Id. at 234, 508 P.2d at 64. The rationale behind that holding was that the legal consequence of holding property jointly was that each party has a separate estate or interest, and, since courts could not divest either party of their separate property, the courts lacked the power to divest either party of jointly held property. As was explained in Collier v. Collier, 73 Ariz. 405, 242 P.2d 537 (1952),

> "Since the interest of a joint tenant is separate property, it follows that a court is without jurisdiction in a divorce proceeding to compel either co-tenant to divest himself or herself of his or her *title*." 73 Ariz. at 412, 242 P.2d at 541. (Emphasis added)

Accord, Porter v. Porter, 67 Ariz. 273, 195 P.2d 132 (1948).

In the instant case, the court below did not order either party to divest himself or herself of his or her title. Rather, the court ordered that Shirley was to have exclusive possession. This distinction between title and possession has been recognized on other occasions by the courts in Arizona. In Proffit v. Proffit, 105 Ariz. 222, 462 P.2d 391 (1969), the court declared:

> "We agree that the divorce court, in pronouncing a divorce decree, has no authority to compel either party to divest himself or herself of *title* to separate property. See A.R.S. § 25–318, subsec. A, and Porter v. Porter, 67 Ariz. 273, 285, 195 P.2d 132, 140 (1948). But in the present case, the court's order did not concern *title*, but *possession*. Defendant was in possession of a sum of money, obtained from the redemption of savings bonds, title to which had been adjudged in plaintiff. The divorce court, as a court of equity, certainly has the inherent power to direct one party to relinquish possession of separate property belonging to the other, just as it has the power to order a division and disposition of the community property of two parties. We hold that the trial judge's order, embodied in the divorce decree, that the defendant pay a sum of money to plaintiff was lawful." 105 Ariz. at 224, 462 P.2d at 393. (Emphasis in original)

See also: Schock v. Schock, 19 Ariz.App. 562, 509 P.2d 634 (1973). Likewise, the court below had the authority to direct Ernest to relinquish possession of the family home.

Ernest argues that he is entitled to be compensated for the postponed enjoyment "of his approximately $10,000 equity". We do not agree. "[W]here the occupying tenant has ousted his co-owners and excluded them from possession of the property or a part thereof, he must answer for the value of the use and occupation . . . ." 20 Am.Jur. Cotenancy and Joint Ownership § 41 (1965). By holding Shirley liable for the mortgage payments while she retains possession, the court below made her answer for the value of the property's use.

Affirmed.

HATHAWAY, C. J., and KRUCKER, J., concur.